# UNITED STATES $v.$ UTAH CONSTRUCTION & MINING CO.

No. 440.   Argued March 23–24, 1966.—Decided June 6, 1966.

*Irving Jaffe* argued the cause for the United States. On the brief were *Solicitor General Marshall, Assistant Attorney General Douglas, David L. Rose* and *Robert V. Zener.*

*Gardiner Johnson* argued the cause for respondent. With him on the brief were *Thomas E. Stanton, Jr., Albert L. Reeves, Jr., J. G. Selway* and *Ronald Larson.*

*Ashley Sellers, Gilbert A. Cuneo* and *David V. Anthony* filed a brief for Shimato Construction Co., Ltd., as *amicus curiae,* urging affirmance.

MR. JUSTICE WHITE delivered the opinion of the Court.

The typical construction contract between the Government and a private contractor provides for an equitable adjustment of the contract price or an appropriate extension of time, or both, if the government orders permitted changes in the work or if the contractor encounters changed conditions differing materially from those ordinarily anticipated. Likewise, it is provided that the contract shall not be terminated nor the contractor charged with liquidated damages if he is delayed in completing the work by unforeseeable conditions beyond his control, including acts of the Government. See Armed Services Procurement Regulations (hereinafter ASPR), 32 CFR §§ 7.602–3 to 7.602–5; Atomic Energy Commission Procurement Regulations (hereinafter AECPR), 41 CFR

§ 9–7.5005–2.[1] Article 15 provides that "åll disputes concerning questions of fact arising under this contract" shall be decided by the contracting officer subject to writ-

---

[1] In the contract presently before us these clauses read as follows:

"Article 3. *Changes.*—

"The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered: *Provided, however,* That the contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the head of the department or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.

"Article 4. *Changed conditions.*—

"Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.

"Article 9. *Delays—Damages.*—

"If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any extension

ten appeal to the head of the department, "whose decision shall be final and conclusive upon the parties thereto." ASPR, 32 CFR § 7.602–6; AECPR, 41 CFR

---

thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby. If the contractor's right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. If the Government does not terminate the right of the contractor to proceed, the contractor shall continue the work, in which event it will be impossible to determine the actual damages for the delay and in lieu thereof the contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted the amount as set forth in the specifications or accompanying papers and the contractor and his sureties shall be liable for the amount thereof: *Provided,* That the right of the contractor to proceed shall not be terminated or the contractor charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes, if the contractor shall within 10 days from the beginning of any such delay (unless the contracting officer shall grant a further period of time prior to the date of final settlement of the contract) notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such appeal as

§ 9–7.5004–3.[2]  Appeals from the decision of the contracting officer are characteristically heard by a board or committee designated by the head of the contracting department or agency.  Should the contractor be dissatisfied with the administrative decision and bring a Tucker Act suit for breach of contract in the Court of Claims or the District Court, 28 U. S. C. § 1346 (a)(2) (1964 ed.), the finality accorded administrative fact finding by the disputes clause is limited by the provisions of the Wunderlich Act of 1954 which directs that such a decision "shall be final and conclusive unless the same is fra[u]dulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." [3]  With respect to this statutory provi-

---

to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto."

[2] The disputes clause in the instant contract reads:

"Article 15. *Disputes.*—

"Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto.  In the meantime the contractor shall diligently proceed with the work as directed."

[3] "[N]o provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: *Provided, however,* That any such decision shall be final and conclusive unless the same is fradulent [*sic*] or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.

"SEC. 2. No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board."  68 Stat. 81, 41 U. S. C. §§ 321–322 (1964 ed.).

sion we held in *United States* v. *Carlo Bianchi & Co.*, 373 U. S. 709, that where the evidentiary basis for the administrative decision is challenged in a breach of contract suit, Congress did not intend a *de novo* determination of the facts by the court, which must confine its review to the administrative record made at the time of the administrative appeal.

The issues in this case involve the coverage of the disputes clause and a recurring problem concerning the application of *Bianchi* to certain findings made during the administrative process. We granted certiorari because of the importance of these questions in the administration of government contracts. 382 U. S. 900.

## I.

The contractor, Utah Construction & Mining Company, executed a contract in March 1953 to build a facility for the Atomic Energy Commission. After completing the project in January 1955, it filed with the contracting officer a "Pier Drilling" claim, which asked for an adjustment in the contract price and an extension of time under Article 4, the "changed conditions" clause. The contractor asserted it had encountered float rock in the course of excavating and drilling which, among other things, had increased its costs and delayed the work. Contrary to the decision of the contracting officer, the Advisory Board of Contract Appeals found the float rock to be a changed condition within the meaning of Article 4. But the Board nevertheless denied the request for a time extension and for delay damages. It found that the increased costs had been incurred by a subcontractor rather than the contractor and that the delay experienced by the contractor was not caused by the float rock but by a dispute over the quality of concrete aggregate furnished by the Government, a dispute not then before the Board for adjudication.

Another claim filed by the contractor, its "Shield Window" claim, asserted the existence of changed conditions calling for relief under Article 4 by reason of inadequate specifications and drawings furnished by the Government. Additional compensation and additional time were demanded. The Board found there was no changed condition within Article 4 and denied additional compensation. However, it found the delay involved to be the result of difficulties inherent in a new field of construction rather than the fault of either party, and it therefore authorized a time extension under Article 9.

In the contractor's subsequent suit for breach of contract, the Court of Claims held both the Pier Drilling claim and the Shield Window claim to be claims for delay damages alleging a breach of contract by reason of the Government's unreasonable delay. In its view, such breach of contract claims were not within the disputes clause and the administrative findings regarding the responsibility for the delays were subject to *de novo* determination in the Court of Claims. The disputes clause limited the authority of the Board to " 'disputes concerning questions of fact *arising under this contract.*' " That meant "a dispute over the rights of the parties given by the contract; it [did] not mean a dispute over a violation of the contract." *Utah Constr. & Mining Co.* v. *United States,* 168 Ct. Cl. 522, 527, 339 F. 2d 606, 609–610 (1964). Because the Advisory Board of Contract Appeals was clearly authorized to determine the cause of the delay in granting or denying the request for an extension of time under Articles 4 and 9, the dissenting judge thought the findings were reviewable only on the administrative record and therefore objected to the *de novo* trial ordered by the majority. 168 Ct. Cl., at 537, 339 F. 2d, at 615 (Davis, J.).

The meaning of the Court of Claims' distinction between disputes over rights given by the contract and

disputes over a violation of the contract has been clarified in a subsequent decision holding that to the extent complete relief is available under a specific contract adjustment provision, such as the changes or changed conditions clauses, the controversy falls within the disputes clause and cannot be tried *de novo* in a suit for breach of contract. *Morrison-Knudsen Co.* v. *United States,* 170 Ct. Cl. 757, 762, 345 F. 2d 833, 837 (1965). With respect to relief available under the contract, therefore, the contractor must exhaust his administrative remedies and the findings and determination of the Board would be subject to review under the Wunderlich Act standards, as applied in *Bianchi.* But the Court of Claims has also ruled that when only partial relief is available under the contract—*e. g.,* an extension of time under Article 4—the remedies under the contract are not exclusive and the contractor may secure damages in breach of contract if the Government's conduct has been unreasonable. See *Fuller Co.* v. *United States,* 108 Ct. Cl. 70, 90–102, 69 F. Supp. 409 (1947); *Kehm Corp.* v. *United States,* 119 Ct. Cl. 454, 465–473, 93 F. Supp. 620 (1950). The issue raised by the decision of the Court of Claims respecting the Pier Drilling and Shield Window claims is therefore whether factual issues that have once been properly determined administratively may be retried *de novo* in subsequent breach of contract actions for relief that is unavailable under the contract.

The other issue of significance in this case is raised by a third claim filed by the contractor and involves the matter referred to by the Advisory Board of Contract Appeals in disposing of the contractor's Pier Drilling claim. The contractor, as it was permitted to do under the contract, elected to purchase concrete aggregate from the government stockpile, discovering very shortly that the aggregate was dirty and its poor quality the cause of understrength concrete. The Government suspended the

work for a time, directed temporary corrective procedures and itself undertook more permanent remedial measures. After completing the contract, the contractor claimed extra compensation based on the poor condition of the aggregate, which was alleged to be a changed condition under Article 4. The contracting officer rejected the claim and the Board ruled the appeal was untimely. It remarked, however, that if the claim was one for unliquidated damages for breach of warranty or for delay, it had no jurisdiction to award monetary relief. Rejecting the Government's position that even if a claim sought only a remedy that was not available under Articles 3, 4 or 9, it nevertheless was within the scope of the disputes clause and subject to "final" administrative determination, the Court of Claims held that unless the claim sought relief for a "change" under Article 3 or "changed conditions" under Article 4 or "excusable delay" under Article 9 and was adjustable by the terms of those provisions, the claim was not within the disputes clause, was not subject to administrative determination and was a matter for *de novo* trial and decision in the proper court.[4]

## II.

We deal first with the issue of the scope of the disputes clause which is raised by the Court of Claims' treatment of the concrete aggregate claim. The Government reasserts here its position in the Court of Claims[5] that the

---

[4] The court did not decide whether or not the substandard aggregate was or was not a "changed condition" under Article 4. This matter it referred back to the Commissioner. It did hold, however, that if the claim fell within Article 4, and if the Board of Appeals had erroneously refused to hear it as untimely, court proceedings should be suspended until appropriate administrative action was completed. This latter determination the Court of Claims refused to follow in No. 439, *United States* v. *Anthony Grace & Sons, Inc., post*, p. 424.

[5] Before the Advisory Board of Contract Appeals the Government asserted a contrary position. See n. 7, *infra*.

disputes clause authorizes and compels administrative action in connection with all disputes arising between the parties in the course of completing the contract. In its view, the disputes clause is not limited to those disputes arising under other provisions of the contract—Articles 3, 4 and 9 in this case—that contemplate equitable adjustment in price and time upon the occurrence of the specified contingencies. If the Government is correct, the concrete aggregate claim was a proper subject for administrative handling even if the substandard aggregate was not a changed condition within Article 4 and even if the claim was for breach of warranty and delay damages. From this and from the Government's position in *United States* v. *Anthony Grace & Sons, Inc.,* *post,* p. 424, which we sustain, it would follow that the factual issues underlying this claim were not subject to a *de novo* trial in the Court of Claims.

We must reject the government position, as did all the judges in the Court of Claims. The power of the administrative tribunal to make final and conclusive findings on factual issues rests on the contract, more specifically on the disputes clause contained in Article 15. This basic proposition the United States does not challenge; and the short of the matter is that when the parties signed this contract in 1953, neither could have understood that the disputes clause extended to breach of contract claims not redressable under other clauses of the contract.[6] Our conclusion rests on an examination of

---

[6] When the contract makes provision for equitable adjustment of particular claims, such claims may be regarded as converted from breach of contract claims to claims for relief under the contract. See *Morrison-Knudsen Co.* v. *United States,* 170 Ct. Cl. 757, 345 F. 2d 833 (1965); Shedd, Disputes and Appeals: The Armed Services Board of Contract Appeals, 29 Law & Contemp. Prob. 39, 74 (1964) ; Kelly, Government Contractors' Remedies: A Regulatory Reform, 18 Admin. L. Rev. 145, 147 (1965). For ease of reference we will

uniform, continuous, and long-standing judicial and administrative construction of the disputes clause, both before and after the contract here in question was executed. Reference to decisions subsequent to 1953 is justified in many cases as a practical construction of the clause by one of the contracting parties, the Government (for it has frequently been the Government that has urged a narrow construction of the disputes clause on the various Boards of Contract Appeals),[7] and in any event as showing the construction on which innumerable other government contractors may have relied in not presenting breach of contract claims to the contracting officer, which claims would now be forever barred under the Government's interpretation by the contractual time limitations on the presentation of claims and appeals.[8]

Beginning in 1937, a series of cases in the Court of Claims decided prior to the execution of this contract had established that the jurisdiction of the Boards of Contract Appeals under the disputes clause was limited to claims for equitable adjustments, time extensions, or other remedies under specific contract provisions authorizing such relief and accordingly that the contractor need not process pure breach of contract claims through the disputes machinery before filing his court action. See, e. g., *Phoenix Bridge Co.* v. *United States*, 85 Ct. Cl. 603, 629–630 (1937); *Plato* v. *United States*, 86 Ct. Cl. 665, 677–678 (1938); *John A. Johnson Contracting Corp.* v.

therefore use the term "breach of contract claims" to refer to contract claims that are not redressable under specific contract adjustment provisions.

[7] With respect to the concrete aggregate claim in this case, for example, the attorney appearing for the contracting officer moved to dismiss for lack of jurisdiction on the ground that the claim was for breach of contract, rather than for an equitable adjustment under Article 4, and did not fall within the coverage of the disputes clause.

[8] By contrast, the period of limitations for contract actions in the Court of Claims is six years. 28 U. S. C. § 2501 (1964 ed.).

*United States,* 119 Ct. Cl. 707, 745, 98 F. Supp. 154, 156 (1951); *Continental Illinois Nat. Bank* v. *United States,* 126 Ct. Cl. 631, 640–641, 115 F. Supp. 892, 897 (1953). That has continued to be the view of the Court of Claims. *E. g., Railroad Waterproofing Corp.* v. *United States,* 133 Ct. Cl. 911, 915–916, 137 F. Supp. 713, 715–716 (1956); *Ekco Products Co.* v. *United States,* 160 Ct. Cl. 75, 84, 312 F. 2d 768, 773 (1963); see also *Hunter* v. *United States,* 9 C. C. F., ¶ 72,647 (D. C. E. D. N. C. 1963), aff'd *per curiam,* 331 F. 2d 741 (C. A. 4th Cir. 1964).

After its creation in 1942, the War Department Board of Contract Appeals quickly accepted the principle established by the *Phoenix Bridge* and *Plato* cases, *Boyer t/a Harry Boyer, Son & Co.,* 1 C. C. F. 53 (1943); *Kirk t/a Kirk Bldg. Co.,* 1 C. C. F. 67, 70–71 (1943), and long prior to 1953 it was the settled practice of the various Boards to refuse to consider pure breach of contract claims, *e. g., Asbestos Wood Mfg. Co.,* 2 C. C. F. 203 (WDBCA 1944); *Specer B. Lane Co.,* 2 C. C. F. 500, 505 (WDBCA 1944); *Rust Engr. Co.,* 3 C. C. F. 1210 (NDBCA 1945). The United States, indeed, grudgingly concedes that the boards "have frequently, and perhaps usually," declined such jurisdiction. Such rulings are in fact legion, see, *e. g., Dean Constr. Co.,* 1965–2 B. C. A., ¶ 4888 (GSBCA 1965); *Prototype Development, Inc.,* 1965–2 B. C. A., ¶ 4993 (ASBCA 1965); *Electrical Builders, Inc.,* 1964 B. C. A., ¶ 4377 (IBCA 1964); *E. & E. J. Pfotzer,* 1965–2 B. C. A., ¶ 5144 (ENG BCA 1965), and the decisions cited therein and in the decision below, 168 Ct. Cl., at 538, 339 F. 2d, at 616, n. 2 (Davis, J., dissenting and concurring), and include decisions of the bodies appointed to administer the disputes clause on behalf of the Atomic Energy Commission, the contracting agency in this case, see *Claremont Constr. Co.,* Dkt. No. 64 (Feb. 14, 1955); *Frontier Drilling Co.,* Dkt. No. 74 (July 1, 1955); *Utah Constr. Co.,* Dkt. No. 91 (Dec. 12,

1956); *J. A. Tiberti Constr. Co.*, Dkt. No. CA–126 (May 2, 1961); but cf. *Fick Foundry Co.*, 1965–2 B. C. A., ¶ 5052, at 23,786. The AEC Advisory Board of Contract Appeals reaffirmed this interpretation of the disputes clause in its discussion of respondent's concrete aggregate claim, see *supra*, p. 403.

The United States does not dispute the fact that the past construction of the standard disputes clause has been that it does not authorize the Boards of Contract Appeals to finally determine, and to grant relief for, all claims related to the contracted work.[9] Instead, it attacks these rulings of the Court of Claims and the Boards of Contract Appeals concerning the scope of the standard disputes clause as erroneous and premised on principles that have since been rejected in other cases. But even if, as an original matter, the language of the disputes clause might have been susceptible of the interpretation urged by the Government, the restrictive meaning of the words "arising under this contract" had long since been established when these parties used them in 1953. The question before us is what the parties intended, not whether the construction on which they relied was erroneous.

The United States, as an alternative argument, would limit the rulings described above to the question of availability of remedy, and it contends that even if it be accepted that the Boards of Contract Appeals are without jurisdiction to grant relief for breach of contract they are nevertheless authorized by the disputes clause to

---

[9] The Government does assert that the NASA Board of Contract Appeals "apparently asserts jurisdiction for some purposes over claims for breach of contract," citing *Doyle & Russell, Inc.*, 1965–2 B. C. A., ¶ 4912. The purpose for which the Board asserted jurisdiction, however, was to determine whether it had authority to grant relief, and the Board also noted that the contractor had asserted a claim for additional compensation under the changes clause.

make binding findings of fact respecting all disputes. The argument is premised in the main on certain unique provisions in the charter of the Armed Services Board of Contract Appeals, which is the successor to the War Department Board of Contract Appeals. Special attention to the ASBCA is justified by its large caseload and its consequent importance as a model for the development of other Boards.

Originally the WDBCA took a narrow view of its jurisdiction, see Shedd, Disputes and Appeals: The Armed Services Board of Contract Appeals, 29 Law & Contemp. Prob. 39, 55 (1964), and as a result the Secretary of War issued on July 4, 1944, a memorandum directing the Board, *inter alia,* to

"[f]ind and administratively determine the facts out of which a claim by a contractor arises for damages against the Government for breach of contract, without expressing opinion on the question of the Government's liability for damages." 9 Fed. Reg. 9463.

Similarly, the present charter of the ASBCA provides that

"[w]hen in the consideration of an appeal it appears that a claim is involved which is not cognizable under the terms of the contract, the Board may, insofar as the evidence permits, make findings of fact with respect to such a claim without expressing an opinion on the question of liability." 32 CFR § 30.1, App. A, Part I, § 5.

It will be noted that on their face the very provisions on which the Government relies in this phase of its argument conclusively refute the broader contention that the Boards may determine and afford relief for all contract claims, for they recognize that some claims for breach of contract may not be "cognizable under the terms of the

contract" and that in such cases the Boards should express no opinion on the question of liability.[10] Nor do the provisions, in terms, provide any support for the view that the Boards may make binding, as distinguished from advisory, findings of fact.

In the first case before the WDBCA under the 1944 directive, the Board ruled that it would retain jurisdiction to hold a hearing and to make findings of fact even though it expressly recognized it could grant no relief and it was "doubtful whether any findings the Board should make . . . would be given any consideration by a court . . . ." *Columbia Constructors, Inc.,* 2 C. C. F. 942 (WDBCA 1944). Such willingness to make findings even though no hearing had theretofore been held was in keeping with the dual function of adjudicatory body and advisor to the Secretary then exercised by the WDBCA, which heard appeals on an advisory basis in the case of contracts that did not authorize the designation of a board as the representative of the Secretary to hear appeals, see generally Smith, The War Department Board of Contract Appeals, 5 Fed. B. J. 74, 77 (1943), and sometimes investigated claims for extraordinary relief under Title II of the First War Powers Act, 55 Stat. 838 (1941), see *Ardmore Constr. Co.,* 3 C. C. F. 255, 265 (WDBCA 1944). Subsequently the contractor's appeal in the *Columbia Constructors* case was dismissed when the contractor represented that he did not desire a hearing if the Board could award no relief, thus confirming the parties' understanding that the 1944 memorandum did not require presentation to the WDBCA of all contract disputes as a prerequisite to a court action. 2 C. C. F. 1162 (WDBCA 1944). In later cases where a hearing had been held in connection with other claims

---

[10] The ASBCA has also interpreted this charter provision as recognizing the narrow interpretation of the disputes clause. *Lenoir Wood Finishing Co.,* 1964 B. C. A., ¶ 4111, at 20,060–20,061.

the WDBCA did make special findings, but without any intimation that such findings were to have binding effect. *E. g., Swords-McDougal Co.,* 3 C. C. F. 238 (WDBCA 1944); *Fiske-Carter Constr. Co.,* 3 C. C. F. 415 (WDBCA 1945); *Hargrave t/a Hargrave Constr. Co.,* 3 C. C. F. 1113, 1120 (WDBCA 1945).

The practice of the ASBCA has evidenced an even narrower understanding of the charter provision authorizing findings without expression of opinion on liability. In cases heard on the merits prior to decision of the jurisdictional question the Board has made special findings in accordance with the charter. See *Specialty Assembling & Packing Co.,* 1959–2 B. C. A., ¶ 2370; *J. W. Bateson Co.,* 1962 B. C. A., ¶ 3293; see also the *Metrig Corp.,* 1963 B. C. A., ¶ 3658. But in *Simmel-Industrie Meccaniche Societa per Azioni,* 1961–1 B. C. A., ¶ 2917, the Board rejected the contractor's contention that "[t]he ASBCA has jurisdiction and is under a duty to make findings of fact in this appeal even if it lacked jurisdiction to make an award to appellant," *id.,* at 15,233. The Board interpreted the charter to mean that it would make special findings only in "appeals where a hearing on the merits has been completed prior to the filing of a rule to show cause or a motion to dismiss." *Id.,* at 15,235. More recently the Board has explained that

> "[g]enerally, as a matter of sound policy, the Board's discretionary right to make findings of fact in instances where a·claim is not cognizable under the contract is not exercised, simply because the Board has no way to afford the parties the remedy which logically would flow from the facts found. The cases wherein the Board has declined to consider an appeal because it had no method within the confines of the contract terms to afford a remedy have sometimes been described, perhaps rather in-

aptly, as being beyond our jurisdiction or beyond our authority to consider. Basically, the lack is not of authority to hear but ·of authority finally to dispose administratively." *Lenoir Wood Finishing Co.,* 1964 B. C. A., ¶ 4111, at 20,061.

As *Lenoir Wood Finishing Co.* indicates, the ASBCA, like the WDBCA, has disclaimed any binding effect for its findings in those cases where it has made special findings solely under authority of the special charter provision. See also *Simmel-Industrie Meccaniche Societa per Azioni, supra,* at 15,235; *J. W. Bateson Co., supra,* at 16,985. Since the ASBCA has declared it is not under any mandatory duty to make findings at a contractor's request in cases where it has no jurisdiction to grant relief, it would seem strange indeed to interpret the disputes clause as embodying the parties' understanding that such cases were nevertheless to be determined administratively.

Since it is so clearly established that the special charter authority to make findings without expression of opinion on liability does not expand the scope of the disputes clause or empower the Board to make binding determinations of fact, one may well ask what purpose such authority, and the findings made pursuant to it, can possibly serve. One obvious answer is that the Board's findings may facilitate a settlement of the contractor's breach of contract claim. For example, the General Accounting Office, which has statutory authority to settle claims against the United States, Budget and Accounting Act, 1921, § 305, 42 Stat. 24, 31 U. S. C. § 71 (1964 ed.), provides no procedure for resolution of factual disputes, 21 Comp. Gen. 244, and thus refuses to undertake settlement where there are substantial factual disputes. Comp. Gen. Dec. B–147326, May 25, 1962; Comp. Gen. Dec. B–149795, Jan. 4, 1963. Accordingly, acceptance

by the parties of the Board's findings might provide the necessary requisite for intervention of the GAO.[11]

Thus the settled construction of the disputes clause excludes breach of contract claims from its coverage, whether for purposes of granting relief or for purposes of making binding findings of fact that would be reviewable under Wunderlich Act standards rather than *de novo*. This is not to say that the Government does not have a powerful argument for construing the disputes clause to afford administrative relief for a wider spectrum of disputes arising between the contracting parties. It can be argued, as the Government persuasively does, that the same considerations which initially led to providing an administrative remedy in those situations covered by such clauses as Articles 3, 4 and 9 of the contract also support the broader reading of the dis-

---

[11] Of course such findings might also provide the foundation for action by other agencies authorized to compromise the claim or otherwise to grant relief, such as the Contract Adjustment Boards, see text, *infra*. With respect to the whole question of settlement, the Government contends that the early restrictive construction of the disputes clause was based in part on the belief that the various departments and their contracting officers had no authority to settle pure breach of contract claims, which view is asserted to have now been abandoned. See *Cannon Constr. Co.* v. *United States,* 162 Ct. Cl. 94, 319 F. 2d 173 (1963). Since the authority of contracting officers to grant relief for all claims, through settlement, is now established, the argument continues, all contract claims may now be the basis of a dispute reviewable under the disputes clause. The error in this argument is that it fails to differentiate between an advance agreement to be bound by the decision of the contracting officer and the Board respecting an equitable adjustment and the power, without being bound prior to agreement, mutually to settle differences. This distinction has not escaped the ASBCA, which has ruled that although it subscribes to the view that contracting officers may negotiate settlements it has no power under the disputes clause to compel negotiation or settlement. *Lenoir Wood Finishing Co.,* 1964 B. C. A., ¶ 4111, at 20,061; accord, *John McShain, Inc.,* 1965–1 B. C. A., ¶ 4844 (GSBCA).

putes clause permitting and requiring administrative fact finding with respect to all disputes arising between the contracting parties. But the coverage of the disputes clause is a matter susceptible of contractual determination, *United States* v. *Moorman,* 338 U. S. 457, subject to the limitations on finality imposed by the Wunderlich Act, and one would have expected modification of the disputes clause to encompass breach of contract disputes if the restrictive interpretation of Article 15 was thought unduly to hinder government contracting. In fact the contracting departments have not rejected the narrower judicial reading of the disputes clause nor attempted any wholesale revision of its language to cover all factual disputes. Instead they have acted to create alternative administrative remedies for some breach of contract claims and to disestablish others by fashioning additional specific adjustment provisions contemplating relief under the contract in specified situations not reached by such provisions as Articles 3, 4 and 9.

An example of the creation of alternative administrative remedies is afforded by the provisions in effect at various times since World War II, see First War Powers Act, Title II, 55 Stat. 838 (1941); Act of January 12, 1951, 64 Stat. 1257, authorizing extraordinary relief for certain claims of contractors. Pursuant to a delegation by the President under the statute presently in effect, Public Law 85–804, 72 Stat. 972, 50 U. S. C. § 1431 (1964 ed.), government departments and agencies exercising functions in connection with the national defense may, upon a finding that such action would "facilitate the national defense," enter into amendments and modifications of contracts without regard to other provisions of law respecting such amendments and modifications. As implemented by the departmental procurement regulations, see ASPR, 32 CFR § 17.000 *et seq.;* AECPR, 41 CFR § 9–17.000 *et seq.,* the authority conferred encom-

passes amendments without consideration, correction of mutual mistakes, and formalization of informal commitments. This authority, which in many respects is analogous to power to settle claims, is delegated to Contract Adjustment Boards established within the departments and agencies concerned separate from the Boards of Contract Appeals. Because the regulations preclude resort to the powers conferred by Public Law 85–804 "[u]nless other legal authority in the Department concerned is deemed to be lacking or inadequate," ASPR, 32 CFR § 17.205–1 (b)(2), the Army Contract Adjustment Board has required contractors to exhaust remedies before the ASBCA under the disputes clause, *Blaw-Knox Co.*, ACAB Dkt. No. 1019, Nov. 2, 1960. However, in *Bendix Corp.*, ACAB Dkt. No. 1050, Sept. 11, 1962, which involved a claim for delay damages arising out of the Government's failure to make the construction site available on time, the Board ruled that the contractor need not present its claim to the ASBCA in view of that body's lack of jurisdiction over claims that were not premised on a provision for adjustment within the contract. Further, the ACAB confirmed that it was empowered to grant unliquidated damages for delay in breach of contract even though the contractor might also have a court action. Likewise, the Boards of Contract Appeals have consistently recognized that while they themselves may be without jurisdiction to grant relief for claimed breaches of contract, such claims, in appropriate cases, could be presented to the Adjustment Boards. See, *e. g., Fiske-Carter Constr. Co.*, 3 C. C. F. 415 (WDBCA 1945); *Ardmore Constr. Co.*, 3 C. C. F. 468 (WDBCA 1945); see generally Smith, The War Department Board of Contract Appeals, 5 Fed. B. J. 74, 82 (1943); cf. *Doyle & Russell, Inc.*, 1965–2 B. C. A., ¶ 4912, at 23,220 (NASA BCA). Thus it is quite evident from the administration of Public Law

85–804 and its predecessors that the limitations on the jurisdiction of the Boards of Contract Appeals are well understood by the military procurement departments and Congress.[12]

An illustration of the disestablishment of breach of contract claims through the fashioning of additional contract adjustment provisions is provided by contractual provisions designed to deal with just such claims for delay damages as are presented here. In response to the importunings of Army contractors following this Court's ruling in *United States* v. *Rice,* 317 U. S. 61, that the contractor's remedy under Article 9 was limited to an extension of time, a "Suspension of Work" clause was adopted for use in construction contracts, see *T. C. Bateson Constr. Co.,* 1960–1 B. C. A., ¶ 2552 (ASBCA 1960), at 12,347–12,348,[13] and has been the basis for administra-

---

[12] The committee reports on Public Law 85–804 indicate that Congress was well aware that the powers conferred under Title II of the First War Powers Act had been used "to extend the time of performance on contracts and to waive liquidated damages provisions" and that "[a]mendments without consideration have also been used to provide relief for defense contractors where losses have resulted from inequitable action of the Government . . . ." H. R. Rep. No. 2232, 85th Cong., 2d Sess., 4, 6 (1958); accord, S. Rep. No. 2281, 85th Cong., 2d Sess., 4, 5 (1958). The House subcommittee said that it had given particular attention to the regulations and administrative procedures employed under Title II and had found them to be proper. H. R. Rep. No. 2232, 85th Cong., 2d Sess., 7 (1958). Congress thus acted upon the clear understanding that certain claims of the type the Government now contends to be covered by the disputes clause were not cognizable under normal contract adjustment procedures, thus necessitating the grant of extraordinary authority in Public Law 85–804.

[13] A typical Suspension of Work clause provided:

"The Contracting Officer may order the Contractor to suspend all or any part of the work for such period of time as may be determined by him to be necessary or desirable for the convenience of the Government. Unless such suspension unreasonably delays the

tive allowance of delay damages in numerous cases. A more extensive clause for "Price Adjustment for Suspension, Delays, or Interruption of Work," ASPR, 32 CFR § 7.604–3, was promulgated in 1961 for optional use in Department of Defense fixed-price construction contracts. Effective April 1965, the clause was made mandatory in such contracts, ASPR § 7–602.46,[14] and the

---

progress of the work and causes additional expense or loss to the Contractor, no increase in contract price will be allowed. In the case of suspension of all or any part of the work for an unreasonable length of time, causing additional expense or loss, not due to the fault or negligence of the Contractor, the Contracting Officer shall make an equitable adjustment in the contract price and modify the contract accordingly." *Barnet Brezner*, 1961–1 B. C. A., ¶ 2895, at 15,119 (ASBCA). See also *T. C. Bateson Constr. Co.*, 1960–1 B. C. A., ¶ 2552, at 12,319 (ASBCA).

[14] This clause provides:

"(a) The Contracting Officer may order the Contractor in writing to suspend all or any part of the work for such period of time as he may determine to be appropriate for the convenience of the Government.

"(b) If, without the fault or negligence of the Contractor, the performance of all or any part of the work is for an unreasonable period of time, suspended, delayed, or interrupted by an act of the Contracting Officer in the administration of the contract, or by his failure to act within the time specified in the contract (or if *no time is specified within a reasonable time*), an adjustment shall be made by the Contracting Officer for any increase in the cost of performance of the contract (excluding profit) necessarily caused by the unreasonable period of such suspension, delay, or interruption, and the contract shall be modified in writing accordingly. No adjustment shall be made to the extent that performance by the Contractor would have been prevented by other causes even if the work had not been so suspended, delayed, or interrupted. No claim under this clause shall be allowed (i) for any costs incurred more than twenty days before the Contractor shall have notified the Contracting Officer in writing of the act or failure to act involved (but *this requirement shall not apply where a suspension order has been issued*), and (ii) unless the claim, in an amount stated, is asserted in writing as soon as practicable after the termination of such sus-

Armed Services Procurement Regulations Committee has proposed its use in fixed-price supply contracts as well. See generally Kelly, Government Contractors' Remedies: A Regulatory Reform, 18 Admin. L. Rev. 145, 148–152 (1965). An Interagency Task Group is currently reviewing the clauses in the standard contract form, including the Changes, Changed Conditions and Suspension of Work clauses, to determine whether they should be expanded in coverage to prevent fragmentation of remedies. See Federal Contracts Report, No. 79, Aug. 23, 1965, pp. A–6—A–7. While in one respect it can be said that clauses broadening remedies under the contract have been adopted in response to restrictive interpretation of the disputes clause and express dissatisfaction with the unavailability of an administrative remedy, the fact that the response has taken this measured form has manifested the parties' reliance on the prior interpretation and has properly tended to reinforce it. As the ASBCA remarked in *Simmel-Industrie, supra,* "[i]t is noteworthy that when it is intended to provide an administrative remedy for Government delays, specific contract clauses have been developed and are set forth for that purpose," 1961–1 B. C. A., at 15,234.

Finally, we may note that development of provisions such as the Suspension of Work Clause illustrates not only administrative acceptance of the narrow interpretation of the disputes clause; it also indicates the lack of any compelling reason for overturning that interpretation at this late stage. Inclusion of such additional clauses in the contract naturally limits the area of disputes falling outside the framework of contractual adjustment and thus outside the disputes clause, as does

---

pension, delay, or interruption but not later than the date of final payment under the contract. Any dispute concerning a question of fact arising under this clause shall be subject to the Disputes clause."

expansive construction of the existing adjustment clauses. As one member of the ASBCA has recently remarked:

> ". . . government procurement agencies started several years ago adding various contract clauses designed to convert what would otherwise be claims for damages for breach of contract into claims payable under such contract clauses and, hence, to be regarded as 'arising under the contract.' This trend has continued to the point where the field of claims for breach of contract that are not regarded as 'arising under the contract' is becoming very narrow indeed. Also there has been an increasing tendency for contract appeal boards to give a broad interpretation to contract clauses as vehicles for the administrative settlement of meritorious contract claims. Decisions where ASBCA dismisses an appeal for lack of jurisdiction as involving a claim for breach of contract are becoming increasingly rare." Shedd, Disputes and Appeals: The Armed Services Board of Contract Appeals, 29 Law & Contemp. Prob. 39, 74 (1964).

For the reasons stated we reject the Government's contention that the disputes clause covers all disputes relating to the contract.

## III.

We are unable to accept, however, the Court of Claims' disposition of the Pier Drilling and Shield Window claims. Although the Board lacked authority to consider delay damages under these two claims, it did have authority to consider the requests for extensions of time under Articles 4 and 9, and these requests called for an administrative determination of the facts. Such findings, if they otherwise satisfy the standards of the Wunderlich Act, are conclusive on the parties, not only with respect to the Articles 4 and 9 claims but also in the

court suit for breach of contract and delay damages. This finality is required by the language and policies underlying the disputes clause and the Wunderlich Act and by the general principles of collateral estoppel.

Both the disputes clause and the Wunderlich Act categorically state that administrative findings on factual issues relevant to questions arising under the contract shall be final and conclusive on the parties.[15] There is no room in the language of Article 15 or of the Act to consider factual findings final for some purposes but not for others. It would disregard the parties' agreement to conclude, as the Court of Claims did, that because the court suit was one for breach of contract which the administrative agency had no authority to decide, the court need not accept administrative findings which were appropriately made and obviously relevant to another claim within the jurisdiction of the board.

The position of the Court of Claims would permit erosion of the policies behind both the Wunderlich Act and the disputes clause. Any claim, whether within or without the disputes clause, can be couched in breach of contract language.[16] The contractual and statutory scheme would be too easily avoided if a party could compel relitigation of a matter once decided by a mere exercise of semantics. Certainly, as the Court of Claims

---

[15] Of course, if the findings made by the Board are not relevant to a dispute over which it has jurisdiction, such findings would have no finality whatsoever. See Part II, *supra; Morrison-Knudsen Co.* v. *United States,* 170 Ct. Cl. 757, 345 F. 2d 833; *Utah Constr. & Mining Co.* v. *United States,* 168 Ct. Cl. 522, 539–540, 339 F. 2d 606, 617 (dissenting opinion of Judge Davis).

[16] See the example given by the Court of Claims below, 168 Ct. Cl. 522, 530, 339 F. 2d 606, 611, where the addition of the adjective "unreasonable" was felt sufficient to transform a dispute under the contract into a breach of contract claim. This position is now rejected. See n. 6, *supra,* and *Morrison-Knudsen Co.* v. *United States, supra.*

itself has since held, where the administrative agency has made relevant factual findings in the course of refusing relief which the contract authorizes it to give, the finality of these findings, if sufficiently supported, cannot be avoided in a court action for the same relief by labeling the refusal of an equitable adjustment as a breach of contract or by asserting that the primary issue involved is a question of law, *Morrison-Knudsen Co.* v. *United States,* 170 Ct.. Cl. 757, 345 F. 2d 833; *Allied Paint & Color Works* v. *United States,* 309 F. 2d 133. Likewise, when the Board of Contract Appeals has made findings relevant to a dispute properly before it and which the parties have agreed shall be final and conclusive, these findings cannot be disregarded and the factual issues tried *de novo* in the Court of Claims when the contractor sues for relief which the board was not empowered to give.

This is no more than our decision in *Carlo Bianchi* requires. We there held that administrative findings in the course of adjudicating claims within the disputes clause were not to be retried in the Court of Claims but were to be reviewed by that court on the administrative record. This result, which was required both by the contract of the parties and by the Wunderlich Act, avoids "a needless duplication of evidentiary hearings and a heavy additional burden in the time and expense required to bring litigation to an end," [17] 373 U. S., at 717, and it encourages the parties to make a complete disclosure at the administrative level, rather than holding evidence back for subsequent litigation. H. R. Rep. No. 1380, 83d Cong., 2d Sess., 5 (1954). These same reasons support the finality, in a suit for delay damages, of all valid and appropriate administrative findings already made in the course of resolving a dispute "arising under" the contract.

---

[17] The Court of Claims observed, for example, that the testimony relating to the Shield Window claim took three days of the Board's time and the transcript runs 453 pages in length.

Although the decision here rests upon the agreement of the parties as modified by the Wunderlich Act, we note that the result we reach is harmonious with general principles of collateral estoppel.[18] Occasionally courts have used language to the effect that *res judicata* principles do not apply to administrative proceedings,[19] but

---

[18] Judge Davis, in dissent below, wrote:

"This is the same general policy which nourishes the doctrine of collateral estoppel. The court is reluctant, however, to apply that principle to these administrative findings because of the nature and genesis of the boards. The Wunderlich Act, as applied in *Bianchi*, should dispel these doubts. The Supreme Court made it plain that Congress intended the boards (and like administrative representatives) to be *the* fact-finders within their contract area of competence, just as the Interstate Commerce Commission, the Federal Trade Commission, and the National Labor Relations Board are *the* fact-finders for other purposes. In the light of *Bianchi*'s evaluation of the statutory policy, we should not squint to give a crabbed reading to the board's authority where it has stayed within its sphere, but should accept it as the primary fact-finding tribunal whose factual determinations (in disputes under the contract) must be received, if valid, in the same way as those of other courts or of the independent administrative agencies. Under the more modern view, the findings of the latter, at least when acting in an adjudicatory capacity, are considered final, even in a suit not directly related to the administrative proceeding, unless there is some good reason for a new judicial inquiry into the same facts. See Davis, *Administrative Law* 566 (1951); *Fairmont Aluminum Co. v. Commissioner,* 222 F. 2d 622, 627 (4th Cir., 1955). The only reasons the majority now offers for a judicial re-trial of factual questions already determined by valid board findings are the same policy considerations which Congress and the Supreme Court have already discarded in the Wunderlich Act and the *Bianchi* opinion." 168 Ct. Cl., at 541–542, 339 F. 2d, at 618.

For a frequently quoted and similar position relating to the finality to be given to findings of an arbitrator, see *Bower v. Eastern Airlines,* 214 F. 2d 623, 626.

[19] *Pearson v. Williams,* 202 U. S. 281; *Churchill Tabernacle v. FCC,* 81 U. S. App. D. C. 411, 160 F. 2d 244.

such language is certainly too broad.[20]   When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose.  *Sunshine Coal Co.* v. *Adkins,* 310 U. S. 381; *Hanover Bank* v. *United States,* 152 Ct. Cl. 391, 285 F. 2d 455; *Fairmont Aluminum Co.* v. *Commissioner,* 222 F. 2d 622; *Seatrain Lines, Inc.* v. *Pennsylvania R. Co.,* 207 F. 2d 255.[21]   See also *Goldstein* v. *Doft,* 236 F. Supp. 730, aff'd 353 F. 2d 484, cert. denied, 383 U. S. 960, where collateral estoppel was applied to prevent relitigation of factual disputes resolved by an arbitrator.

In the present case the Board was acting in a judicial capacity when it considered the Pier Drilling and Shield Window claims, the factual disputes resolved were clearly relevant to issues properly before it, and both parties had a full and fair opportunity to argue their version of the facts and an opportunity to seek court review of any adverse findings.  There is, therefore, neither need nor justification for a second evidentiary hearing on these matters already resolved as between these two parties.[22]

---

[20] See generally, 2 Davis, Administrative Law Treatise §§ 18.01–18.12 (1958); Groner & Sternstein, Res Judicata in Federal Administrative Law, 39 Iowa L. Rev. 300 (1954).

[21] *Commissioner* v. *Sunnen,* 333 U. S. 591, and *United States* v. *International Building Co.,* 345 U. S. 502, clearly contemplated the application of principles of *res judicata* to administrative findings, although for other reasons in those cases, *res judicata* was not applied.

[22] Had the contractor not sought an extension of time in this case, he would have forfeited this relief "under the contract" for failure to exhaust administrative remedies.  But, at the same time, the findings which the Board made in connection with the time extension claim would not then have been available for introduction in the breach of contract action for relief not available under the contract.

Accordingly, in light of the above, we affirm the Court of Claims in its interpretation of the scope of the disputes clause and we reverse as to its failure to give finality, in the suit for delay damages and breach of contract, to factual findings properly made by the Board.

*It is so ordered.*