**BREDA TRANSPORTATION, INC., Plaintiff,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Defendant.**

**Civil Action No. PJM 01–551.**

United States District Court, D. Maryland.

Sept. 28, 2001.

John H. Korns, Paul M. Laurenza, Oppenheimer Wolff and Donnelly, LLP, Washington, DC, Mary Margaret Utterback, Thelen Reid & Priest, LLP, Washington, DC, for plaintiff.

Thomas B. Dorrier, Donald A. Laffert, Washington Metropolitan Area Transit Authority, Washington, DC, for defendant.

## *OPINION*

MESSITTE, District Judge.

The Court considers whether the present dispute involving a government procurement contract belongs in this Court or whether it should be heard by the Armed Services Board of Contract Appeals ("Board"). Plaintiff Breda Transportation, Inc. ("Breda") has filed a Motion for Partial Summary Judgment arguing that the case is properly before this Court. Defendant Washington Metropolitan Area Transit Authority ("WMATA") has filed a Motion to Dismiss or, in the alternative, for Summary Judgment, contending that the Board should hear the case. For reasons the Court now undertakes to explain, it will GRANT WMATA's Motion to Dismiss and DENY Breda's Motion for Partial Summary Judgment.[1]

---

1. WMATA's alternative request for summary judgment is therefore MOOT and Breda's Motion for Preliminary Injunction is DENIED.

## I.

Breda is a Delaware corporation headquartered in New York. Among other things, it assembles and rehabilitates subway cars and other transit vehicles. WMATA is the interstate compact agency of the District of Columbia, Maryland and Virginia responsible for the operation and construction of the public transit system in the metropolitan Washington, D.C. area.

On or about September 18, 1992, Breda entered into a contract ("Contract") with WMATA to install new "A/C drive traction" motors in WMATA's metro cars, presumably taking possession of the cars for purposes of installation. Between October 1994 and November 1996, Breda delivered the rehabilitated cars and, in June 1998, WMATA informed Breda that the motors had passed reliability testing. During the winter of 1999–2000, however, the cars began to repeatedly fail. Accordingly, by letters dated March 13 and April 19, 2000, WMATA notified Breda that a latent defect existed and requested a plan of action to address it. Breda apparently did little or nothing to assuage WMATA's concerns. As a result, in October of 2000, WMATA's Contracting Officer issued a "Final Decision" that the motors contained a latent defect which had caused the failure of their electrical system and that Breda had neither corrected the defect nor provided any plan of corrective action. Based on this decision, WMATA informed Breda that it was revoking its acceptance of the transit cars and that it would repair all the motors and charge Breda for the cost of the repairs—estimated to be $13 million. WMATA also advised Breda that, pursuant to the Disputes Article of the Contract, any

appeal of its decision would be heard by the Board.

■ In November 2000, Breda appealed the Contracting Officer's Final Decision to the Board, reserving, however, its objection to the Board's jurisdiction.[2] In February 2001, Breda filed a complaint for declaratory and injunctive relief in this Court, accompanied by a motion for preliminary injunction seeking to enjoin the proceedings before the Board on the grounds that the Board lacked jurisdiction over the dispute. The jurisdictional issue now comes before the Court on the parties' cross-motions for summary relief.

## II.

■ For purposes of determining jurisdictional questions, the Court is the finder of jurisdictional facts. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982). Whether the Board, as opposed to the Court, has jurisdiction over this dispute in the first instance is essentially a question of contract interpretation. *See United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 404, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966) (determining that the scope of administrative tribunal's jurisdiction is based on "longstanding judicial and administrative construction of the disputes clause"); *Norair Eng'g Corp. v. WMATA*, 33 F.Supp.2d 422, 425 (D.Md.1998). If the Contract gives the Board jurisdiction, Breda will be required to exhaust its remedies there before coming to Court. *See Utah Construction*, 384 U.S. at 402, 86 S.Ct. 1545. If the Contract does not give the Board jurisdiction, Breda is entitled to a trial *de novo* here. *Id.* at 404, 86 S.Ct. 1545.

---

**2.** Breda contends that time constraints required it to file an appeal with the Board despite its view that the proper forum for resolution of the dispute was federal court. Although WMATA argues that, by appearing

before the Board, Breda waived any right it had to go to court in the first instance, the Court finds Breda's action plausible and that Breda has waived none of its rights thereby.

The Contract between Breda and WMATA is a standard supply and service contract containing forty-six Articles, including a Disputes Article which establishes procedures for the administrative resolution of disputes before WMATA's Contracting Officer. Pursuant to that Article, the Contractor may appeal the Contracting Officer's decision to the Board which, as indicated, has been designated by WMATA's Board of Directors as its authorized representative under the Contract.[3] The Board's decision is "final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." (Contract § 1, Art. 11.)

■ Not every dispute under the Contract, however, goes before the Board based on the Disputes Article. As well-established law makes clear, some other provision of the Contract must commit the dispute to administrative resolution before the Board is authorized to act. *See Utah Construction,* 384 U.S. at 404–5, 86 S.Ct. 1545. As the Fourth Circuit has held:

> [A]dministrative resolution of a given claim is only authorized if some other provision of the contract establishes an administrative remedy sufficient to afford full relief for the claim. Thus a Disputes clause is best understood as merely establishing an administrative procedure for resolving quarrels. Other contractual provisions, by granting a contract administrator authority to afford some remedy for the quarrel, must in effect confer jurisdiction.

*WMATA v. Buchart–Horn, Inc.,* 886 F.2d 733, 735 (4th Cir.1989).

On that much the parties agree. They also agree that resolution of their jurisdictional dispute involves Paragraph (b) of the Inspections Article of the Contract as well as Subparagraphs (b)(1) and (b)(2). The Court considers the language of that key section[4]:

> b. In case any supplies or lots of supplies are defective in material or workmanship or otherwise not in conformity with the requirements of this Contract, the Authority shall have the right either to reject them (with or without instruction as to their disposition) or to require their correction. Supplies or lots of supplies which have been rejected or required to be corrected shall be removed or, if permitted or required by the Contracting Officer, corrected in place by and at the expense of the Contractor promptly after notice, and shall not thereafter be tendered for acceptance unless the former rejection or requirement of correction is disclosed. If the Contractor fails promptly to remove such supplies or lots of supplies which are required to be removed or promptly to replace or correct such supplies or lots of supplies, the Authority may either:
>
> 1. By contract or otherwise replace or correct such supplies and charge to the Contractor the cost occasioned the Authority thereby; or
>
> 2. Terminate this Contract for default as provided in the DEFAULT article of this Contract. Unless the Contractor corrects or replaces such

---

3. (*See* Contract § 1, Art. 11 ("The decision of the Board of Directors *or its duly authorized representative* for the determination of such appeals shall be final and conclusive ....") (emphasis added).) There is no dispute that the Armed Services Board of Contract Appeals is the "duly authorized representative" of WMATA's Board of Directors.

4. "Contractor" in the quoted section refers to Breda, "Authority" to WMATA.

supplies within the delivery schedule, the Contracting Officer may require the delivery of such supplies at a reduction in price which is equitable under the circumstances. Failure to agree to such reduction of price shall be a dispute concerning a question of fact within the meaning of the DISPUTES article of this Contract.

### III.

Breda reads Subparagraphs (b)(1) and (b)(2) of the Inspections Article as providing WMATA with three options in the event Breda fails to promptly correct the defective parts after receiving notice from WMATA. First, under (b)(1), WMATA may "[b]y contract or otherwise replace or correct [the defective parts] and charge to [Breda] the cost occasioned the Authority thereby." Second, under (b)(2), WMATA may "terminate . . . for default as provided in the DEFAULT article of this Contract." Third, under (b)(2), WMATA may "require the delivery of the defective parts at a reduction in price which is equitable under the circumstances."

Of these three, Breda argues that only (b)(1) applies. According to Breda, WMATA's revocation of its acceptance of delivery, plus its decision to correct the allegedly defective motors, plus its attempt to charge Breda the cost of that correction, combine to bring that Subparagraph into play. In consequence, Breda says, because (b)(1) does not expressly invoke the Disputes Article, jurisdiction lies not with the Board but with this Court. Breda submits that (b)(2), which contains the Inspections Article's only reference to the Disputes Article and constitutes an alternative to (b)(1), is not implicated in the present case. That Subparagraph, Breda argues, confers jurisdiction on the Board only when WMATA accepts delivery of defective or noncomplying supplies, when

it does not require their correction, and when it seeks an equitable reduction in price.

Breda contends that the concept of an equitable reduction in price in (b)(2) is distinct from the cost of repair in (b)(1). It argues that an "equitable reduction in price" is identical to an "equitable price adjustment," a term of art that Breda argues is measured not by the cost incurred by WMATA in making the repairs, but by the altered cost position of Breda. *See General Ry. Signal Co. v. WMATA,* 875 F.2d 320, 324 (D.C.Cir.1989) ("The term 'equitable adjustment' is a legal term of art . . . [t]he proper measure of the adjustment is 'the difference between what it would have cost to perform the work as originally required and what it cost to perform the work as changed.' ") (citation omitted). To the extent WMATA has decided to repair the motors and has sought recovery based on an estimate of *its* cost, Breda concludes, (b)(1) remains applicable.

WMATA advances two arguments in favor of Board jurisdiction. First, it contends that the explicit invocation of the Disputes Article in Subparagraph (b)(2) applies to both Subparagraphs (b)(1) and (b)(2). Its view is that the Contract merges (b)(1) and (b)(2) by reason of the common reference to "such supplies" in the final introductory sentence of Paragraph (b), and in Subparagraphs (b)(1) and (b)(2).

Alternatively, WMATA argues that the remedy it seeks falls under (b)(2) because the cost of repair, whether estimated or actual, is tantamount to a "reduction in price which is equitable under the circumstances." Therefore, it says, invocation of the Disputes Article under (b)(2) operates to create Board jurisdiction. WMATA challenges Breda's contention that a "reduction in price which is equitable under the circumstances" has the same meaning as an "equitable price adjustment," point-

ing to the use of the latter term in several other provisions of the Contract as evidence of the difference between the two.[5] WMATA argues that the calculation of a "reduction in price which is equitable under the circumstances" is not tethered to Breda's cost position any more than it is to WMATA's.[6]

## IV.

■ The Court notes that the plain language of a government contract, read as a whole, must be enforced and that the contract must be interpreted in a manner that makes sense. *See* 64 Am.Jur.2d *Public Works and Contracts* § 103 (2001). Accordingly, "the language of a government contract must be given the meaning that a reasonably intelligent person acquainted with the contemporaneous circumstances would reach." *Chas. H. Tompkins Co. v. United States*, 43 Fed Cl. 716, 722 (1999) (citation omitted).

That said, the Court acknowledges that, organizationally, Paragraph (b) and Subparagraphs (b)(1) and (b)(2) of the Inspections Article are somewhat puzzling.[7] Subparagraph (b)(1) sets out, reasonably enough, that the cost of replacement or repair of defective supplies may be charged to the Contractor. But while Subparagraph (b)(2) talks in its first sentence about termination of the Contract for default, in its second sentence it refers to delivery of the supplies with a reduction in price which is equitable under the circumstances. The third sentence of (b)(2) triggers the Disputes Article upon failure of the parties to agree upon the equitable reduction in price. But whereas the second and third sentences of (b)(2) have a logical nexus between them, there is no apparent connection between the first sentence (termination for default) and the second and third sentences (acceptance with a price reduction which is equitable). Presumably, if the Contract were terminated for default, WMATA would have no goods on hand whose price would need to be renegotiated. From a logical standpoint, one might expect the second and third sentences of (b)(2) (acceptance of supplies with a price reduction) to be part of and follow the first sentence of (b)(1) (acceptance of supplies plus cost of replacement or repair) or at least to be a separate Subparagraph, perhaps re-numbered (b)(2), with the termination for default language of the present (b)(2) becoming a new (b)(3).

■ Be that as it may, the Court agrees with Breda that the language of the Inspections Article effectively provides three options for WMATA in the event that Breda fails to promptly correct the defective parts after receiving notice from WMATA.

---

5. (*See, e.g.,* Contract § 1, Art. 2, ¶ b ("If any such change causes an increase or decrease in the cost of, or the time required for the performance of any part of the work under this Contract, ... an equitable adjustment shall be made in the Contract price ...."); Contract § 1, Art. 10, ¶ b ("If a stop work order issued under this article is cancelled or the period of the order or any extension thereof expires, the Contractor shall resume work. An equitable adjustment shall be made in the ... Contract price ....").)

6. WMATA is presumably animated by a desire to minimize its cash outlay as well as its risk.

Rather than bear the expense of making the repairs and run the risk of not recovering from Breda, it has chosen to withhold payment of part of the purchase price in the amount of its estimate of the cost of the repairs.

7. This is not to say that the *language* of the Contract is ambiguous, only that the Contract's organization is somewhat puzzling. Even if the language were ambiguous, it would still be for the Court, as the finder of jurisdictional fact, to resolve the ambiguity. *See Adams,* 697 F.2d at 1219.

The question is, which option applies in the present case.

The Court does not see the facts characterizing this dispute as fitting squarely within the terms of (b)(1). WMATA remains in possession of allegedly nonconforming goods and has decided that they require repair. But, as the Court reads Subparagraph (b)(1), it authorizes WMATA to charge Breda for replacement or repairs *after they have been accomplished.* It provides that WMATA may "replace or correct [the defective supplies] and charge to the Contractor the cost occasion*ed* the Authority thereby." (Emphasis added). But replacement or repairs have yet to be accomplished, and WMATA has not incurred any costs in this regard, merely estimates.

On the other hand, the Court does not accept WMATA's argument that Subparagraph (b)(2)'s reference to the Disputes Article sends this dispute to administrative resolution regardless of whether the dispute falls under (b)(1) or (b)(2). That reading is plainly at odds with the structure of the Inspections Article. Wherever the last two sentences of (b)(2) might more logically be placed, it is clear that the Disputes Article—hence Board jurisdiction—applies only where defective goods are accepted, are not corrected by Breda, and the parties are unable to agree on an equitable reduction in price.

■ The Court concludes that it is the second and third sentences of (b)(2) that control and that any confusion that may exist as to their applicability very likely occurs as a result of failing to distinguish between the nature of the relief WMATA seeks and the measure of damages it is entitled to. As the Court sees it, the critical consideration is the nature of the relief sought. Having accepted the defective supplies, uncorrected by Breda, WMATA seeks a "reduction in price which is equitable under the circumstances." What an equitable reduction may be is, of course, an open question. But the measure of that reduction is something for the Board to decide, not the Court. It seems unlikely, under Board precedent, that Breda is correct that WMATA is precluded from receiving any sort of equitable reduction on the grounds that it has accepted the supplies and decided to correct the defective parts itself.[8] On the other hand, it may well be that the cost of replacement or repair would qualify as a reduction in price which is equitable under the circumstances.[9] Whatever may be the measure

8. *See Appeal of Techni Data Labs.*, 1977 WL 2218, ASBCA 21054, 77–2 BCA ¶ 12,667 (1977) (holding that Government was entitled to a price reduction after correcting the defective parts itself); Appeal of *R.C. Allen Business Machines, Inc.*, 1972 WL 1437, ASBCA 12932, 72–1 BCA ¶ 9325 (1972) (holding that Government was entitled to an equitable reduction in price even though it made corrections without giving Contractor the opportunity to do so); *see also* John Cibinic, Jr. and Ralph C. Nash, Jr., *Administration of Government Contracts* at 882 (3d ed.1995) (noting that the Government may "accept work with a reduction in price if the contractor could not correct the defect within the delivery schedule. Since post-acceptance defects claims are most often asserted after the delivery date, the Government would have this alternative.").

9. *See Appeal of John Lembesis Co.*, 1980 WL 2670, ASBCA 24100, 80–2 BCA ¶ 14,571 (1980) (holding that price adjustment based upon Government's costs was acceptable since Government had performed the corrective work); *Appeal of Triple "A" Machine Shop*, 1972 WL 1360, ASBCA 16844, 73–1 BCA ¶ 9826 (1972) (awarding Government a downward equitable price adjustment in the amount of its costs to correct Contractor's defective work). Notwithstanding these cases, Breda still remains free to argue to the Board that "a reduction in price which is equitable under the circumstances" means the same thing as an "equitable price adjustment."

of damages, it is for the Board, not the Court, to decide.

The result is that WMATA is entitled to dismissal of the case, and its Motion to Dismiss will accordingly be GRANTED. Breda's Motion for Partial Summary Judgment, as well as its Motion for Preliminary Injunction, will be DENIED.

A separate order will be entered implementing this Opinion.

### ORDER

Upon consideration of Plaintiff Breda Transportation, Inc.'s Motion for Partial Summary Judgment and Defendant WMATA's Motion to Dismiss or, in the alternative, for Summary Judgment, for the reasons set forth in the accompanying Opinion, it is, this _____ day of August, 2001,

ORDERED:

1. Defendant's Motion to Dismiss (Paper # 9–1) is GRANTED;

2. Plaintiff's Motion for Partial Summary Judgment (Paper # 11) is DENIED;

3. Defendant's Motion for Summary Judgment (Paper # 9–2) is MOOT;

4. Plaintiff's Motion for Preliminary Injunction (Paper # 3) is DENIED;

5. The Clerk of the Court shall CLOSE this case.