EDGAR W. ALLEN, PLAINTIFF-APPELLANT, v. JUNE STRE-
LECKI, DIRECTOR OF THE DIVISION OF MOTOR VE-
HICLES IN THE DEPARTMENT OF LAW AND PUBLIC
SAFETY OF THE STATE OF NEW JERSEY, DEFEND-
ANT-RESPONDENT.

Argued September 12, 1967—Decided December 4, 1967.

*Mr. Donald E. Clarick* for appellant (*Messrs. Clarick & Clarick,* attorneys).

*Mr. Jeffrey R. Lowe,* Deputy Attorney General, for respondent (*Mr. Joseph A. Hoffman,* Assistant Attorney General, of counsel; *Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

FRANCIS, J. Plaintiff, Edgar W. Allen, sought a review in the Appellate Division of an order of the Director of the Division of Motor Vehicles suspending his driver's license for a period of one year from December 18, 1965. *R. R.* 4:88–8. The Appellate Division affirmed without opinion, and we granted Allen's petition for certification. 48 *N. J.* 136 (1966).

On August 5, 1964 around 3 A. M., while driving his truck on Route 537, Millstone Township, Allen was involved in an accident in which a pedestrian died. The circumstances were rather unusual but need not be recounted in any detail because they play no substantial part in the controversy before the Court. Although he became aware that his truck had come in contact with the victim, he did not stop and render aid, nor did he report the incident to the police or to the Division of Motor Vehicles. Some time later the police investigation uncovered his involvement. He was then charged in the Municipal Court with violation of *N. J. S. A.* 39:4–96 (reckless driving), *N. J. S. A.* 39:4–97 (careless driving), *N. J. S. A.* 39:4–129 (leaving the scene of an accident) and *N. J. S. A.* 39:4–130 (failure to report an accident). On October 5, 1964 he pleaded guilty to the violation of *N. J. S. A.* 39:4–129 and 39:4–130; the careless driving and reckless driving charges were dismissed. Later the Grand Jury declined to indict on a Death by Auto charge.

Some years ago the Director of the Division of Motor Vehicles adopted a "Point System Regulation" under which "points" are assessed against a licensed driver upon violation of various sections of the statutes governing operation of motor vehicles. The number of points imposed varies depending upon the type of the infraction. Under the established scale, leaving the scene of an accident results in assessment of eight points against the violator's record. According to the Director's statement the same number of points, *i. e.* eight, is assessed irrespective of whether the ac-

cident involved minor property damage or a death; "they are assessed on mere evidence that a conviction has been recorded."

More specifically in reference to this case the pertinent parts of the Director's regulation in force at the time of the accident said:

"The New Jersey Point System is a driver corrective measure designed to discipline traffic law violation repeaters.

"It operates exclusively from the central office of the Division of Motor Vehicles, in Trenton. The driver records which form the basis for action against repeaters are traffic law convictions in the magistrates' courts which the law requires the courts to report to the division. Traffic law convictions of New Jersey drivers in other States and Canadian Provinces likewise become a part of the operator's record.

A driver amassing 12 or more points within a three-year period dating from the latest violation, becomes subject to a hearing before the Director, in Trenton, on a rule to show cause why his driving privilege should not be revoked. * * *

Only moving violations such as speeding, reckless driving, ignoring a traffic signal, etc., are charged against the driver's record. * * *

The following scale of points is observed:

|  |  |  |  |  |  |  | Points |
|---|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * | * |

Involvement in fatal accident
(if held responsible) ....................................... 12
Leaving scene of accident .................................. 8
* * *."

This regulation was revised on January 13, 1965 when the number of points for previously unspecified violations was listed. However, the point assessment for involvement in a fatal accident was eliminated, i. e., "Involvement in fatal accident (if held responsible) * * * 12 points." Since then there has been no reference to fatal accidents in the regulation. The suggestion is that the Director prefers to deal independently with fatal-accident cases under the broad power conferred by *N. J. S. A.* 39:5–30 over licenses and their suspension or revocation.

The point system appears to be administered in this fashion: When conviction of a listed violation is reported by

a municipal court, the scheduled points are assessed against the driver automatically. The form used for this report does not require notation that a fatality was involved. The assessment of points is fed into a computer which then discloses the number of points accumulated by the driver and the offenses involved. The listing of the last offense in the computer report, such as leaving the scene of accident, would not reveal that a fatality was involved, nor would there be any particularization of the circumstances attending the listed infractions. When this report discloses 12 or more points. the driver's license is not affected until the Director, through the designated member of her staff, reviews it and notes in the blank space provided on the form the proposed length of suspension. In fixing the period ordinarily the factors considered are the nature of the Title 39 violations involved, their frequency and number, the total number of points accumulated and the driver's age. The specific facts or circumstances under which the violations occurred apparently do not normally enter into the decision as to the length of the suspension. As the Director informs us, this is because the tremendous volume of violations reported, points assessed and suspensions imposed make it administratively necessary to operate in this largely automatic fashion. By way of illustration, the Director has advised that in 1966 there were approximately 25,000 notices of proposed suspensions sent to licensees for point system violations. During the same period action was taken to suspend the driving privileges of 349 drivers for involvement in fatal accidents. We are told also that no statistics are available to show the number of drivers whose fatal accident also involved a point system case arising from a violation of the Motor Vehicle Act which, although not a causative factor in the production of the accident, nevertheless brought their accumulated points up to 12 or more, and thus warranted suspension.

According to the Director, cases arising out of fatalities are generally given more complete attention and considera-

tion than those not involving death. Following notice of the fatal accident, the Division awaits the investigation report of the New Jersey State Police. In the meantime, if the Division receives notice of the driver's conviction in the municipal court of some Motor Vehicle Act violation arising out of the accident, and this violation calls for assessment of points, the information is fed to the computer. If the computer shows an accumulation of 12 or more points this fact is reported automatically on a form which contains a notice of proposed suspension, with the period of suspension blank. The blank is filled in by the proper person as above indicated, and sent to the driver, notifying him that he may request a hearing thereon. The notice sets forth the specific violations for which the 12 points have been amassed. There is no reference to the ongoing investigation of the death aspect of the accident, or to the fact that a further suspension may be imposed if the investigation reveals culpable conduct.

When the State Police investigation is completed and forwarded to the Division, it is turned over to the Fatal Accident Board for review. This Board was established by the Director to study the results of investigation in death cases, and to recommend whether a notice of proposed suspension should be issued to the motorist. If the Board finds culpable conduct on the part of the driver, a notice of proposed suspension is sent to him indicating the effective date thereof as well as the grounds therefor, and advising him of his right to hearing. At no time, either during review of the investigation or when it recommends sending a notice of suspension, does the Board know whether or not the driver has been convicted of a motor vehicle law violation arising out of the accident, which violation may already have resulted in suspension of the driver's license, or may subsequently have that result, because of the accumulation of 12 or more points. Thus it is possible, as the Director concedes, for a driver connected with a fatal accident to have his license suspended for accumulated points, some of which reflect the naked conviction record of a violation as-

sociated with the mishap. Thereafter, following review of the circumstances of the accident, the driver may be given a further suspension. In connection with the Board's study of the accident, obviously a recommendation for suspension of driving privileges would not be limited to situations in which there was a finding of responsibility for the fatal accident. For example, investigation might establish that a driver was not guilty of carelessness which caused the mishap. But if such faultless driver left the scene of the accident knowing that his car had been involved, without finding out if the victim lying in the roadway was dead or alive, and without attempting to furnish or to obtain aid, the Board might well treat the violation of *N. J. S. A.* 39 :4–129 as sufficient in itself to warrant suspension.

The Director explains that this procedure is a matter of administrative expediency and, in fact, necessity. She says it would be impracticable to establish a method which would integrate the fatal accident investigation and review by the Board, with the point system operation so that both aspects of a case could be handled simultaneously. The purpose of the point system is to take action as quickly as possible after the accumulation of 12 points by a driver, so that such drivers may be removed from the road promptly and the safety of the public as well as their own thus safeguarded. Subject to the cautionary comments set forth hereafter, we cannot say that such method of operation is beyond the Director's statutory authority.

In the present case when the Division received notice from the municipal court of Allen's conviction for leaving the scene of the accident, eight points were assessed against him automatically. The report form used by the court was provided by the Director, as required by *N. J. S. A.* 39 :5–42. The only places on this form for reference to the violation involved are two very small blank spaces, one for the date and time of the violation, and the other marked "Violation title number" under which appears "39 :4–129." There is

nothing on the form to show that Allen's violation was connected with a fatal accident.

When the violation was given to the computer, a report emerged showing the following violations and points assessment:

| "8/5/64 | Leaving scene of accident | Millstone | 8 Points |
| 3/12/63 | Speeding 62/50 | New York | 4 Points |
| | | Total | 12 Points." |

The form on which this record appeared also said: "In accordance with the provisions of R. S. 39:5–30 you are hereby notified of the proposed suspension of your New Jersey driving privileges for a period of ——." The period "2 months" was inserted in the blank in the manner explained above. Then the notice was sent to Allen, with the advice as to his right to hearing. There was no intimation that this proposed suspension was dependent in any way upon the fact that a death was involved in the last noted violation, or that the death would result in any future action or possible further suspension.

Allen felt that his driving record did not warrant a two months' suspension, and since he needed a motor vehicle in his business, he applied for a hearing. The request was granted and on January 14, 1965, Allen appeared with his attorney before a hearing examiner. His position there was that in view of his long and good driving record, and the fact that the speeding and leaving-the-scene-of-an-accident convictions were separated by about a year and a half, any suspension of his driving privilege for more than one month ought to be considered excessive.

At this hearing a question arose as to the extent to which the circumstances of the fatal accident should be introduced and considered. In discussing this in his report, the Hearer noted: "Counsel feels it is improper at this time to go into the details of the fatal accident," and "I agree." The plain inference is that counsel felt that since the established scale automatically called for eight points

upon a conviction for leaving the scene of an accident, without regard to the circumstances, and irrespective of whether the accident resulted in death or a minor injury or just property damage, the hearing should be limited to an appraisal of the penalty in light of the bare fact of an accumulation of 12 points in a long and otherwise unblemished driving record. The Hearer's report shows further that there was a discussion between him and Allen's attorney about a future hearing concerning the fatal accident. It notes counsel's statement that he would probably represent Allen if such a hearing were held "based upon [the] fatal accident investigation." It sets forth also counsel's contention that any further extension of the license suspension at such a hearing would be invalid. The importance of this discussion is that Allen and his attorney were made aware that upon completion of the Fatal Accident Board's review of the investigation of the accident, further action with respect to suspension might be taken by the Director.

Since the Hearer sustained Allen's attorney's contention, no evidence as to the circumstances of the accident was introduced. At the conclusion of the hearing, which was largely concerned with Allen's past driving record, the Hearer recommended against a reduction in the two months' suspension, saying that such suspension was warranted on the conviction record alone without regard to the circumstances of the accident. He recommended further that an immediate Board meeting be held on the fatal accident investigation.

The Director approved the Hearer's recommendation and on January 14, 1965 notified Allen that the two months' suspension would stand. On the same day a further notice was served on him stating that the Division proposed under N. J. S. A. 39:5–30 to set a license revocation period of two years dating from December 18, 1964, the effective date of the original suspension. Obviously this notice stemmed from a recommendation of the Fatal Accident Board. The reason assigned was that Allen had been

"convicted 10/5/64 in the Millstone Township Court for violation of Section 39:4–129 R. S. (leaving scene of accident) and violation of Section 39:4–130 R. S. (failure to report an accident) arising out of an accident occurring on August 5, 1964 on Co. Rt. 537, Millstone Township, Monmouth County, N. J., which resulted in the death of John P. Bradham, Jr., of Millstone Township, New Jersey."

*N. J. S. A.* 39:5–30 provides:

"Every * * * license certificate to drive motor vehicles may be suspended or revoked * * * by the commissioner [now Director] for a violation of any of the provisions of this Title or on any other reasonable grounds, after due notice in writing of such proposed suspension, revocation or prohibition and the ground thereof."

He was advised also that if requested within 10 days he could have a hearing thereon. It will be observed that unlike the notice of December 8, 1964, this one refers to the fact that the leaving the scene of accident violation was connected with an accident which resulted in a death; also it included as a reason for revocation, Allen's conviction of failing to report the fatal accident.

At Allen's request a hearing was held on March 15, 1965. At that time the details of the fatal accident, to the extent that his involvement therein could be shown, were established. There were no eye witnesses to the accident itself, but it was shown beyond question that Allen's truck was involved, and that he was driving it. Further it appeared beyond doubt that he left the scene after discovering that his vehicle had been in contact with a human being and not "a sack of potatoes" or "a duffle bag" as he first thought. Because of lack of proof as to the manner in which the accident happened, the Hearer concluded there was insufficient evidence to support a charge of careless driving, *i. e.,* insufficient evidence to hold him responsible for the fatal accident. But in reporting this conclusion to the Director, he said also that unquestionably Allen knew he had been in an accident, saw the victim on the roadway, and left the scene without rendering or attempting to render aid or

moving the victim from the roadway, or attempting to obtain aid for him. The Hearer found no "mitigating circumstances" attending the departure, and he considered the violation of *N. J. S. A.* 39:4–129 a particularly grievous one because according to the state trooper who reached the scene some time later, there was still life in the victim. The record does not show how long life continued, but the plain inference is that death occurred very shortly thereafter. Although there was no proof that immediate medical aid might have saved the life of the victim, obviously the Hearer considered inexcusable Allen's failure to try to obtain aid.

The report concluded with a recommendation that Allen's license be suspended for a period of two years. Exceptions to the report and a supporting memorandum were filed with the Director. After considering the matter the Director ordered that the license be suspended for one year effective December 18, 1965.

Allen contended before both the Hearer and the Director that since he had already been penalized by the Director for the leaving-the-scene-of-an-accident violation by a two-months' suspension of his driver's license, it constituted double jeopardy to charge him again with the same offense and to impose a new and additional penalty upon him for it; that the charge was barred by principles of administrative *res judicata,* and finally, that it constituted improper and unjust vexation and harassment to penalize him twice for the same offense. Both Hearer and Director rejected the contentions.

In a written memorandum the Director said that under the point system, points are levied upon a driver automatically on mere evidence that a conviction of leaving-an-accident-scene has been recorded. This is done without regard to the circumstances of the particular accident, and in cases involving fatalities further consideration is given to the nature of the accident and the character of the violation.

The memorandum discusses the circumstances under which Allen left the fatal-accident scene. It does not disagree with the Hearer's finding that the evidence did not support a charge of careless driving. Obviously it is limited to a finding that the leaving-the-scene was an aggravated offense in view of the circumstances outlined therein. The Director then concludes that the circumstances provided adequate basis for suspension; also that Allen's failure to report the accident in violation of *N. J. S. A.* 39:4–130 (which is not included in the points regulation), provides adequate ground to suspend the license under *N. J. S. A.* 39:5–30. Accordingly the Hearer's recommendation for suspension was approved but the period was fixed at one year.

Allen urges that since he was not held responsible for the fatal accident, he is being punished twice for the same offense, *i. e.*, leaving the scene of an accident. Aside from other considerations to be discussed, this argument overlooks the fact that at least a portion of the suspension was based on the *N. J. S. A.* 39:4–130 failure to report violation. That portion cannot be determined from the record, and if it were true that the remaining portion for the other infraction amounted to double punishment, the matter would have to be remanded for reconsideration of the term of suspension. See, *Lubliner v. Board of Alcoholic Bev. Control*, 33 *N. J.* 428, *pp.* 441–442 (1960); *United States v. Utah Constr. & Mining Co.*, 384 *U. S.* 394, 421, 86 *S. Ct.* 1545, 16 *L. Ed.* 2d 642 (1966); 2 *Davis, Administrative Law*, § 18.03, *p.* 557 (1958); and compare, *Sealfon v. United States*, 332 *U. S.* 575, 68 *S. Ct.* 237, 92 *L. Ed.* 180 (1948); *State v. Cormier*, 46 *N. J.* 494 (1966); Note, 21 *Rutgers L. Rev.* 274 (1967).

We accept the Director's explanation of the procedure adopted in bringing about an accommodation between the operation of the point system and the handling of fatal accident cases for purposes of administering her broad authority to suspend or revoke driving privileges. Therefore, it cannot be said on the record before us that Allen is being penalized twice for leaving the scene of the accident. Nor

can it be held that this two-step process constitutes an exercise of her authority which exceeds the legislative grant. If a driver has accumulated 12 or more points, and the Director in her discretion concludes that public safety warrants immediate suspension of his license, and such action is taken on the basis of the bare record of violations, the section of the Motor Vehicle Act transgressed, the frequency of the violations and the age and status of the driver, the suspension is within the scope of her authority. But a caveat must be added. Fairness would seem to require (1) that the driver be made aware at the time of the initial suspension that if the accident which brought his points accumulation up to or beyond 12 involved a fatality, an additional or increased period of suspension or a revocation may be imposed upon completion and review of the investigation; and (2) that in cases like the present one if the period of suspension is increased, he will be given a credit for any portion of the suspension already served.

In this case, as already noted, the first notice of proposed two-months' suspension did not advise Allen that any further action was contemplated. In our view such advice should have been given, and we assume that some procedure will be established within the Division to accomplish it routinely in this type of case in the future. But here if Allen was given credit for the two-months' suspension already suffered when the one-year withdrawal of his driving privilege was imposed, he suffered no prejudice. At the hearing on the reasonableness of the two-months' suspension he argued successfully, and with apparent familiarity with the Director's practice, that the only matters to be considered were the bare fact of his previous convictions of violation of the sections of the Motor Vehicle Act shown by the record, the time lapse between the convictions, and his driving experience. The Hearer sustained his objection to receipt of proof as to the circumstances of the fatal accident, the scene of which he admitted leaving.

The proof Allen introduced at this hearing related to such matters as his age, number of years licensed to drive, his yearly mileage, and occupation, and reveals a familiarity with the administrative practice of the Director in such cases. The Hearer's report is enlightening:

"Counsel points out exposure (miles driven) by his client, his clear prior record. He stated that subject requires a license to help operate the small business but won't lose job as hasn't lost job (works for father). * * * He did indicate that his client pleaded guilty to a technical charge of 39:4–129. Other charges of 39:4–97 and 39:4–96 were dismissed. Counsel points out the space between 2 single offenses. He feels 1 month suspension is warranted and anything more would be harsh and unreasonable. Counsel feels that in over 90% of the cases of 12 points only 1 month is given. He feels 1 month is fair in this case.

Counsel stated he will probably represent subject if a future hearing is held based upon fatal accident investigation. * * *"

Thus it appears that Allen was aware at the first hearing of the possibility of further action being taken respecting his driving privileges on the basis of the fatal accident investigation. Although he indicated to the Hearer his contention that any such action would be illegal, his objection revealed knowledge, not lack of knowledge, of the potentiality of such action.

This is an unusual case, and one which probably does not occur very often. If the Fatal Accident Board had recommended the further suspension of Allen's license because in its view the investigation showed that he *negligently caused* the fatal accident, and had indicated that fact on the second notice of suspension, obviously an independent basis for suspension was being used. And if at a requested hearing on that notice the Hearer found Allen's careless driving had caused the death, no question of double punishment could have been raised. In such event the suspension for the accumulation of 12 points for the violations specified in the first notice would have represented a different cause. See *Taylor v. England*, 213 *A. 2d* 821 (*D. C. App.* 1965). The novelty of Allen's case is that the second

suspension was not based upon a finding that his manner of driving caused the fatal accident. Rather it was predicated upon a finding that his leaving the scene of a fatal accident was an aggravated and abhorrent form of the statutory offense. He knew beyond all doubt that his vehicle had been in contact with the victim; yet he drove away leaving the dying man on the roadway, without helping him or obtaining any help for him, or even notifying the authorities of his involvement. Under the circumstances in our view the situation presented a fatal accident case within the ambit of the Director's procedure, and justification existed for treating it by the two-step suspension method.

As we said earlier, we are satisfied that Allen suffered no prejudice because of the procedure followed in bringing about his two-part suspension for leaving the scene of the fatal accident. As stated above also, fairness for the ordinary motorist in cases like this one requires adoption of some method of notifying him at the time of his first suspension on account of the 12 points accumulation that when the review of the circumstances of the fatal accident is completed, he may receive notice of a further suspension. The manner of accomplishing this we leave to the Director's expertise. It might be done by adding to the form of notice of suspension: "If a fatal accident was involved in a reported conviction, a later notice of additional suspension or revocation may be issued." There is yet another possibility. The time lapse between the sending of the notice of suspension based on the accumulation of 12 points, and the completion of the review of the State Police report would seem to be sufficient to permit the Fatal Accident Board in making its study of the case to have before it for consideration as one of the factors, the suspension already imposed. Even if the licensee was given a hearing on the first suspension, a proper computation based on the dates appearing in the Director's affidavit shows that ordinarily there would be 51 days between the hearing and the completion of the Board's review. There is nothing in the record to demon-

strate that it would be difficult or impossible administratively for the Board to obtain or to have furnished routinely the information about the earlier suspension. If such information is made available, the Board will be in a position to give credit for the previous loss of driving privileges.

Finally, we come to the question whether credit on the one-year suspension period was given or intended to be given by the Director. The memorandum of November 30, 1965 affirming the action of the Hearer but reducing his recommended two-year suspension to one year says:

"* * * Ordered that the driving privilege of Edgar W. Allen be and the same is hereby suspended effective immediately and for a period of one year from the date his driver's license is received in the Division of Motor Vehicles."

The formal suspension order specifies the effective date as December 18, 1965. No reference is made either to the earlier two months' license deprivation, or to the allowance of a credit for it.

Under all the circumstances, the action of the Director is affirmed, but the matter is remanded to her to give credit for the earlier suspension if it was not taken into account in fixing the one-year suspension.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and HANEMAN—6.

*For reversal*—None.