**HUMPHREYS & HARDING, INC.,**
**Appellee,**

v.

**PITTSBURGH–DES MOINES STEEL**
**COMPANY, Appellant.**

**No. 12130.**

United States Court of Appeals
Fourth Circuit.

Argued May 9, 1968.

Decided June 17, 1968.

Alexander M. Heron, Washington, D. C. (John T. Hazel, Jr., Fairfax, Va., on brief), for appellant.

John L. Kilcullen, Washington, D. C. (John Ninian Beall, Jr., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and BRYAN, Circuit Judges.

**ALBERT V. BRYAN, Circuit Judge:**

Engaged on a Government construction project, the general contractor, Humphreys & Harding, Inc., and its subcontractor, Pittsburgh-Des Moines Steel Company,[1] conceded that their contract embodied two provisions, pertaining to arbitration, for adjustment of disputes but disagreed on which was applicable to effectuate a settlement of their difference in the present circumstances. The project was the terminal building at the Dulles International Airport in Virginia and the instant rift arose upon a question of additional and extra work. On the petition of Humphreys under the Federal Arbitration Act, 9 U.S.C. § 1 et seq., to force arbitration of the controversy, the District Court directed Pittsburgh to abide by the administrative remedies contained in the prime contract and noted in the subcontract. Pittsburgh appeals, convinced that the subcontract arbitration procedure controls. We take the view of the trial court.

The prime contract, dated June 8, 1961, between Humphreys and the United States, as the owner, called for the completion of the terminal building under the supervision chiefly of the Federal Aviation Agency and the named architect. The subcontract, made on July 14, 1961, was between Humphreys and Pittsburgh. Among other things, it covered the furnishing and erection of steel mullions and related work required for curtain walls on the north and south sides of the building, all to be done under the direction and to the satisfaction of the general contractor, the architect and the owner.

The mullions had to be fitted into openings in the walls. It was clearly contemplated that they could be fabricated by duplication, inasmuch as they would be of uniform dimensions. This meant that the openings would have to be identical in size, so that a typical mullion frame would fill each of them. These spaces, with appropriate supporting members,

1. Humphreys & Harding, Inc., was chartered by New York and has offices in Washington, D.C.; Pittsburgh-Des Moines Steel Company is a Pennsylvania corporation with its offices there.

were prepared by a preceding independent contractor; the completion of that work established Pittburgh's starting point. But when Pittsburgh came to do its job, the openings were found not to conform to the contract drawings, in that all of them varied in dimension. Thus Pittsburgh was confronted with the problem of placing the frames into apertures of diverse measurement, and duplicate fabrication was not feasible. Nevertheless the subcontractor undertook to meet these conditions.

Pittsburgh asked for $82,791.09 as added costs incurred by reason of the extra work. Its claim—that all of it was in excess of the work stipulated in the contract—was submitted to the architect through the general contractor via the Contracting Office who was the Government's representative. After consultation with the architect, the Contracting Officer allowed the subcontractor only $21,274.22 and ordered the Government to pay it. Accounting for the difference between the demand and the allowance was the architect's determination that the remainder of the claim represented work which was originally demandable of the subcontractor and was not occasioned by the variation in size of the wall openings. In computing the allowances the Contracting Officer did not question the accuracy of the subcontractor's figures. In his report, he advised the general contractor of its right to appeal to the Federal Aviation Agency Contract Appeals Panel, pursuant to the rules set forth in the disputes procedure section of the Federal Aviation Agency Procurement Regulations issued in 28 Fed.Reg. 6268, June 19, 1963, now found in 41 C.F.R. § 2–60.000 et seq.

For recovery of the deficiency Pittsburgh sued Humphreys in the Circuit Court of Fairfax County, Virginia, pleading a breach of the subcontract. Thereupon Humphreys filed the present petition under the Federal Arbitration Act and prayed the District Court to enjoin prosecution of the State court action pending "an arbitration decision". This was the designation Humphreys gave the

administrative remedy mentioned in the Contracting Officer's report. It appears in the prime contract as a disputes clause and is referred to in the subcontract as "arbitration under the General Contract". It amounts simply to an appeal before the FAA Contract Appeals Panel. However, if not content with the outcome there, the general contractor may sue the United States in the Court of Claims for the recovery asserted. Wunderlich Act, 41 U.S.C. §§ 321, 322. The District Court granted the injunction, from which this appeal by Pittsburgh is taken.

When advised of the subcontractor's dissatisfaction with the Contracting Officer's judgment, Humphreys, the general contractor, sought a review by the FAA Contract Appeals Panel. While the general contractor suggests that this step was not required on its part, its course rested on paragraph 2, the first of the two subcontract provisions for the composition of controversies. It should be examined before discussion of the other settlement procedure, paragraph 18, upon which Pittsburgh relies. Paragraph 2 states:

"Should it appear that the work hereby intended to be done is not sufficiently detailed or explained on the said drawings, or in the said specifications, the Subcontractor shall apply to the Architect through the General Contractor, for such further drawings, details or explanations as may be necessary and shall conform to the same as part of this contract. In the event of any doubt or question arising respecting the true meaning of the drawings or specifications reference shall be made, through the General Contractor, to the Architect, whose decision thereon shall be binding and conclusive on both parties hereto; provided, however, that in case the same matter is in dispute between the General Contractor and the Architect or Owner, and is by them referred to arbitration under the General Contract, the determination of any matter relating to the Subcontractor by said arbitration be-

tween the General Contractor and the Architect or Owner, shall be conclusive and binding upon the Subcontractor. * * * "

To be underscored here is Pittsburgh's consent to be conclusively bound by the architect's translation of the drawings and specifications. The architect made such a determination and, to repeat, in so doing excluded certain of Pittsburgh's claims on the finding that the work embraced therein was an integral part of the work initially required of the subcontractor. This ruling was the foundation of the Contracting Officer's award to Pittsburgh and charge against the United States of the additional amounts in the form of allowances.

Pittsburgh's response is that the architect's sole province was interpretation, and that the dollar amounts to be assigned claims were not for his judgment. The replication of the general contractor, however, is that the architect did not make the award, that the Contracting Officer did so on the architect's readings. As noted, of those claims satisfied, each allowance was exactly the amount sought, so that no disagreement exists as to the reasonableness of the charges to the Government.

According to our grasp of the contract, the architect's decision ended Pittsburgh's case. With decision on the drawings and specifications left exclusively to him, and Pittsburgh's own computation applied to his decision, no further right of claim remained for Pittsburgh. Hence, if Humphreys does not press the appeal to the FAA Panel, and if Pittsburgh persists in refusing to join with Humphreys in this review, then Pittsburgh has reached the end of its means of recovery.

Pittsburgh argues that it still has a breach of contract claim, contending that it may treat the subcontract as terminated when its performance, as originally specified, was thwarted by the prior contractor's failure to leave uniform openings. This argument will not stand, because Pittsburgh was obligated by the subcontract's Rider "A" and paragraph 3 to carry on with extra or additional work when directed by Humphreys. The rider reads as follows:

"Upon written authorization of the General Contractor, the Subcontractor agrees to undertake under the conditions of this Contract, additional or extra work at the stipulated unit prices or for the estimated cost of material, equipment, labor, insurance and taxes prevailing at the time of the change, plus 10% for overhead and 10% for profit, or on a time and material basis of actual cost of such items as checked and approved by the General Contractor, plus 10% for overhead and 10% for profit, and as approved by the Owner."

Paragraph 3 follows:

"The General Contractor may at any time during the progress of this work, make any additions to, alterations in, or deviations from, the drawings or specifications or revisions without invalidating this agreement, and if such additions, alterations, or deviations shall result in any additional work or or in the omission of any of the work, then, in that event the fair and reasonable value of the same shall be added to, or deducted from, the amount herein agreed to be paid by the General Contractor; provided, however, that no additional work shall be considered an extra unless the same shall be done in pursuance of a written order signed by the General Contractor."

The position of Pittsburgh is that paragraph 18, the other settlement provision, and not paragraph 2 governs and entitles Pittsburgh to arbitration of the alleged breach. It reads:

"In the event that the General Contractor and the Subcontractor fail to agree as to the reasonable value of any omission or addition * * * or in case of any other dispute arising between the General Contractor and the Subcontractor, then the matter in dispute shall be referred to a board of arbitrators, created as follows: Each party

shall appoint, in writing, an arbitrator, and give written notice of such appointment to the other party, and the two so appointed shall thereafter appoint a third person. The parties shall present to the arbitrators the facts to substantiate their respective claims and a decision in writing, shall be rendered after such submission. The decision of any two of the arbitrators shall be binding upon the parties."

In our opinion the Pittsburgh versus Humphreys controversy has never come within the reach of paragraph 18. Paragraph 2's declaration that the architect's resolution should be conclusive forestalled a paragraph 18 arbitration. The latter was not drawn to override the architect's determination or to anticipate the use of paragraph 2. The clause of 18—"in case of any other dispute arising between the General Contractor and the Subcontractor"—envisions a quarrel not otherwise solvable under the subcontract. To treat 18 as paramount and exclusive would completely sterilize paragraph 2, surely an undesired result. These conclusions are manifest in the terms of paragraph 2. It explicitly binds the subcontractor to the verdict of "arbitration under the General Contract" on any clash between the sub and the general contractor when the same contest exists between the general and the architect and owner.

By appealing the Contracting Officer's conclusion and, necessarily, the architect's too, Humphreys submitted the instant issue to "arbitration under the General Contract", within the phrasing of paragraph 2. This is the administrative channel established under the "disputes clause" of Humphreys' contract with the Government. No other means of squaring disagreements was prescribed in that contract. Therefore, the disputes procedure Humphreys followed must have been what the parties meant by the word "arbitration" in paragraph 2. Our conclusion has further support in the wide latitude of definition by other courts of "arbitration". E. g., Corbetta Construction Co., Inc. v. Michigan Mutual Liability Co., 20 A.D.2d 375, 247 N.Y.S.2d 288 (1964); Madawick Contracting Co. v. Travelers Ins. Co., 307 N.Y. 111, 120 N.E.2d 520 (1954); Stiers Bros. Const. Co. v. Broderick, 60 F.Supp. 792 (D.C. 1945).

The design for decision we have outlined furnishes a pattern avoiding inequities. It brings the three interested parties into a concourse which will permit, if justified, a recovery of the subcontractor to be assessed against the United States, the ultimately answerable party. If the claim of Pittsburgh were now submitted to the arbitrators under paragraph 18 of the subcontract, as now urged, an injustice could readily result. The arbitrators' award would not be binding upon the United States. Moreover, no assurance of indemnity would be accorded the general contractor, although it was not responsible for the blockage of Pittsburgh's pursuit of its original agreement. Furthermore, if there were an award against the general contractor under paragraph 18, it would then have to go forward with the administrative appeal, assuming it was not barred by time. Havoc could follow. If on the appeal the architect's view were modified, and the paragraph 18 arbitrators had previously agreed with the architect and fixed the allowance accordingly, their award would be wholly upset by the appeal. Certainly, such a tortuous course would not comport with Pittsburgh's ideal of expedition in arbitration. Incidentally, the resort of Pittsburgh to the State court action, rather than to a petition under the federal Arbitration Act, implies an uncertainty of whether paragraph 18 was really the appropriate remedy.

The final contention of Pittsburgh is that its claim is for damages for breach of contract, i. e., prevention of its performance of the subcontract in its original terms, and that such a claim is beyond the realm of administrative review under a Government contract. The authority cited is United States v. Utah Construction & Min. Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). Consideration of this point, however, is

not required. Rider "A" and paragraph 3 anticipated changes of this kind in the work schedule and they reveal the parties' intention that the necessity for such different or additional work should not constitute a breach.

Pittsburgh need not fear its interests will not be aggressively pursued by Humphreys through the administrative process. The subcontractor has been invited to take part and may, in fact, be able to assume the primary role in pressing the appeal.[2] Furthermore, success on appeal would inure to Humphreys' benefit. It would take away the possibility, however remote or meritless, of a later lawsuit on this dispute, and the accompanying trouble and expense of defending it.

The judgment of the District Court will be upheld.

Affirmed.

---

2. There is nothing novel in this procedure. See Gardner Displays Co. v. United States, 346 F.2d 585, 587, 171 Ct.Cl. 497 (1965). Also Nash and Cibinic, Federal Procurement Law (1966) at 21–28.