**James B. YATES, Plaintiff,**

v.

**PHILIP MORRIS INC., Defendant.**

**No. 85 Civ. 3402 (CSH).**

United States District Court,
S.D. New York.

March 23, 1988.

Jonathan Ben–Asher, Legal Aid Soc., Staten Island, N.Y., for plaintiff.

Eric Taussig, New York City, for defendant.

MEMORANDUM OPINION
AND ORDER

HAIGHT, District Judge:

Plaintiff James B. Yates maintains he was wrongfully discharged by defendant Philip Morris, Inc. as a result of his race and national origin. Plaintiff sues under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, (1982), and under the Civil Rights Act of 1866, 42 U.S.C. § 1981.

Philip Morris now moves to dismiss plaintiff's § 1981 claim on grounds of collateral estoppel, claiming that that cause of action was finally determined by a finding of "No Probable Cause" issued by the New York State Division of Human Rights ("NYSDHR"). In addition, defendant moves to dismiss plaintiff's Title VII claim alleging national origin discrimination, arguing that plaintiff waived that cause of action by his failure to raise it before the NYSDHR and Equal Employment Opportunity Commission ("EEOC").

## I. COLLATERAL ESTOPPEL

### A. Procedural Background

By my opinion of July 15, 1987, familiarity with which is assumed, I held that the NYSDHR's prior finding in this case did not bar plaintiff's claims under Title VII because of the limited *res judicata* effect given state administrative findings in Title VII proceedings, as described by the Supreme Court in *University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 3224, 92 L.Ed.2d 635 (1986). However, noting in footnote 4 of my prior opinion that the parties had not briefed the question, I expressed no view on the issue of "whether the doctrine of collateral estoppel, or issue preclusion, has any bearing on plaintiff's purported § 1981 claim" (as opposed the Title VII claim), and gave defendant additional time to bring a motion to dismiss on those grounds, if so advised. In response to my invitation, defendant now brings the instant motion to dismiss.

According to defendant's papers, defendant moves to dismiss plaintiff's § 1981 claims "pursuant to Rule 12(b)(4)." Federal Rule of Civil Procedure 12(b)(4) provides for motions alleging "insufficiency of process." However, the parties' papers in no way discuss the legal sufficiency of the summons. I take it that defendant's reference to Rule 12(b)(4) was merely a typographical error and that defendant instead intended to move for dismissal under Fed. R.Civ.P. 12(b)(6), the correct rule by which *res judicata* principles may be asserted.

### B. The NYSDHR Decision

On September 28, 1984 the NYSDHR issued its decision in this case, finding "that there is No Probable Cause to believe that the respondent(s) engaged in or was (were) engaging in the unlawful discriminatory practice complained of." The NYSDHR listed the following factual determinations in support of its conclusion:

The gravamen of the complaint was that the complainant was "discriminated against because (he was) Black" and that his "termination was racially motivated."

The cumulative file confirms a core issue that the respondents were dis-satisfied with the work performance of the complainant and that the complainant was offered an opportunity to interview for "two available positions" with the respondents.

The cumulative file establishes that the complainant made a decision not to pursue the interview process which was pre requisite [sic].

The conclusion of the respondents was that the complainant left the employment of the respondent of his own volition and not for any other reasons but his own exercise of choice.

(Defendant's Memorandum of Law, Exhibit 3). Although hardly a model of clarity, I interpret the NYSDHR's finding of no probable cause as having relied on a single factual issue that the NYSDHR determined adversely to plaintiff—specifically, that plaintiff's termination, rather than being racially motivated, was instead based on defendant's dissatisfaction with plaintiff's work performance.[1]

---

1. Of course the NYSDHR finding also referred to the fact that "because of [defendant's] dissatisfaction," plaintiff was "offered an opportunity to interview for 'two available positions' with the respondents" and that "complainant made a decision not to pursue the interview process." Significantly, although it made those observations, the NYSDHR did *not* find that plaintiff's failure to interview with other companies affiliated with his employer constituted a voluntary resignation from his job. Nor could it. Nowhere in the record is there evidence that defendant ever offered plaintiff an alternative to his old job—only that plaintiff was offered an "interview" and that he would be given "special consideration" for a job with Philip Morris, U.S. A. (Affidavit of Arthur Goldfarb at ¶ 4.) Since

defendant does not refute plaintiff's contention that the jobs discussed were entry level positions at presumably lower pay, (affidavit of James Yates, December 1983, at ¶ 12), and since it cannot be said that plaintiff ever refused a "transfer" to another job, plaintiff was, in reality, fired from his job on July 28, 1983 during the meeting at which Philip Morris supervisors told him that his old job was no longer available to him (Plaintiff's Memorandum at Exhibit A)—and not on August 15, 1983, when plaintiff received his formal notice of termination which cited his refusal to pursue other jobs. Thus, any reference in the NYSDHR decision to plaintiff's failure to interview for other jobs—in effect, after he had already been fired—is mere sur-

182

Evidence in the record supports the NYSDHR's finding that Philip Morris was dissatisfied with plaintiff's work performance, but other evidence submitted by plaintiff is diametrically opposed. For example, a two-page memorandum signed by Yates' supervisor Mike Rimakis and dated May 12, 1982 describes in detail deficiencies in plaintiff's performance that "were factors for the decision to put Mr. Yates on probation" in 1982. And by affidavit Mr. Rimakis described for the NYSDHR how on May 12, 1983 he, in the presence of Christos Kotsakis, another Philip Morris supervisor, advised Yates that he was on probation and would be fired if his work did not improve. In addition, Rimakis swore in his affidavit that "[o]n a number of occasions, I advised [Yates] of his unsatisfactory performance." (Pltf. Mem. at Exhibit A). Yates, on the other hand, also by sworn affidavit submitted to the NYSDHR, has said unequivocally that "[a]t no time during my tenure at Phillip [sic] Morris International was I advised by Mr. Kotsakis or any other person that my performance was unsatisfactory."

Defendant also maintains that Yates was reprimanded for excessive use of "incentive items"—complementary gifts given to purchasers by Philip Morris salesmen. Kotsakis testified in his affidavit that "[o]n November 29, 1983, Complainant was cited for not adhering to Company regulations regarding incentive items and reporting procedures. He was told by me to either follow instructions or face termination." (Kotsakis aff. at ¶ 6.) Concerning that particular incident, Yates replied in an affidavit by saying: "We [Philip Morris salesmen] were all told that we were using incentive items excessively. I was not singled out in any way during this discussion." (Yates aff., Aug. 30, 1984, at ¶ 4.) In response to Yates' denial, Rimakis rejoined: "At a Fall 1982 meeting, Complainant was singled out for using an excessive number of incentive items particularly

Marlboro vests. As a matter of fact, Complainant used three times more vests, jackets and towels than any other Sales Representative." (Rimakis aff. at ¶ 5.)

Clearly, these conflicting accounts cannot be reconciled.

*C. Discussion*

Under the Supreme Court's decision in *University of Tennessee v. Elliott, supra,* the findings of state administrative proceedings of a judicial character may properly be given preclusive effect in actions brought pursuant to 42 U.S.C. § 1981. The the Court explained its reasoning, and described the conditions under which preclusive effect is warranted, as follows:

> We also see no reason to suppose that Congress, in enacting the Reconstruction civil rights statutes, wished to foreclose the adaptation of traditional principles of preclusion to such subsequent developments as the burgeoning use of administrative adjudication in the 20th century.... Accordingly, we hold that when a state agency "acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate," [*United States v.*] *Utah Construction & Mining Co., supra,* 384 U.S. [394], at 422, 86 S.Ct. [1545] at 1560 [16 L.Ed.2d 642 (1966)], federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's court's.

*Elliott, supra,* 106 S.Ct. at 3226–27. *See also DeCintio v. Westchester County Medical Center,* 821 F.2d 111, 118 n. 13 (2nd Cir.1987) (specifically applying *Elliott* to claims under 42 U.S.C. § 1981).

Referring to the requirements laid down in *Elliott* for granting preclusive effect to state administrative findings, plaintiff seeks to prove that he was not afforded a full and fair opportunity to litigate before the NYSDHR and that, as a result, New York courts would not give *res judicata* effect to the Division's findings, thus man-

plusage, and cannot be considered a basis for the NYSDHR's finding of no probable cause.

On a related issue, defendant also maintains that plaintiff was terminated in part because of budgetary constraints. Since the finding of the

NYSDHR does not cite that assertion as a basis for its decision, I need not consider whether plaintiff had a fair opportunity to litigate that, or any other issue not clearly relied upon by the NYSDHR.

dating the same result in this federal court under *Elliott.* Although posed as two separate theories, plaintiff's contentions involve the same core issue—whether Yates had a fair opportunity to litigate his claim before the NYSDHR.

Plaintiff maintains he was deprived of a fair opportunity to present his case because the adjudicatory procedure used by the NYSDHR in this case had two fatal flaws. First, plaintiff complains that the NYSDHR's investigation was a "cursory paper review" that was woefully inadequate because it did not include a "confrontational conference" and no "witnesses, including Mr. Yates, [were] ever contacted or interviewed." Second, plaintiff argues he was deprived of a fair opportunity to litigate by the fact that the Division "never sought documents from Philip Morris to determine the racial or ethnic composition of its workforce or to investigate how other, similarly situated employees were treated."

Plaintiff's second basis is irrelevant to the NYSDHR's finding that defendant terminated plaintiff for legitimate, nondiscriminatory reasons, and thus it carries no weight. The first basis, however, deserves serious attention.

New York courts have defined in the following manner the procedure that the NYSDHR is to use in determining whether there is probable cause for a complaint:

[T]he Commissioner should give a complainant full opportunity to present on the record, though informally, his charges against his employer or other respondent, including the right to submit all exhibits which he wishes to present and testimony of witnesses in addition to his own testimony. In the course of investigating the complaint the Commissioner, of course, should interview respondent's witnesses and receive its responses to the complaint.

*State Division of Human Rights v. New York State Drug Abuse Control Commission,* 59 A.D.2d 332, 336, 399 N.Y.S.2d 541, 544 (1977). If the Commissioner finds that the evidence before him establishes the existence of probable cause, then a formal public hearing will be held at which sworn and cross-examined testimony may be taken. N.Y.Exec.Law § 297(4c) (McKinney 1982).

As a practical matter, a conference involving both parties to the dispute is usually held as part of the NYSDHR investigatory process. Plaintiff maintains, and defendant does not deny, that no such conference was held in the case at bar. Although such conferences are not mandatory, *State Division of Human Rights v. Mecca Kendall Corp.,* 53 A.D.2d 201, 203, 385 N.Y.S. 2d 665, 667 (1976), New York courts clearly pay close attention to the question of whether a conference was held in deciding whether a complainant was given a fair opportunity to litigate his case. New York courts have frequently refused to recognize the results of NYSDHR investigations where those inquires did not include a "confrontation" conference. *See Hendel v. New York State Division of Human Rights,* 114 A.D.2d 897, 495 N.Y.S.2d 135 (1985) ("The 'investigation' consisted of no more than an examination of the papers submitted by the parties. There was no conference."); *Altiery v. State Division of Human Rights,* 61 A.D.2d 780, 402 N.Y.S. 2d 405 (1978) (conference held, but with only one side present); *Gregory v. New York State Human Rights Appeal Board,* 64 A.D.2d 775, 407 N.Y.S.2d 256 (1978) ("determinations by the Division or the Appeal Board of no probable cause have been overturned as capricious where the underlying investigation was one-sided and abbreviated either for failure to hold a confrontation conference or to examine witnesses crucial to complainant's case").

A conference is particularly vital where, as here, written testimony going to the central issue in a case creates unavoidable questions of witness credibility. In the case at bar it is hard to imagine how the affidavits and other "paper" evidence could be any more at odds. In such a situation, a conference or other in-person method of investigation must be considered a fundamental element to the complainant's right to fully and fairly litigate his case. Even if such were not the case, there is at least some support for the proposition that New York law requires that any time the NYSDHR decides not to conduct the cus-

tomary conference it must place its reasons for that decision clearly on the record—an obligation that was not met here. *See Mecca, supra,* 385 N.Y.S.2d at 667 ("the fact that [the conference] was not held was properly considered an abuse of discretion absent an explanation for the change in ordinary procedure").

I conclude in the light of existing New York case law that the NYSDHR's failure to assess the credibility of conflicting written testimony through some sort of confrontation conference or other in-person proceeding deprived plaintiff of a fair opportunity to litigate his claim; that New York courts would refuse to give preclusive effect to the NYSDHR's findings; and that defendant's motion to dismiss plaintiff's § 1981 claim must accordingly be denied.

## II. PLAINTIFF'S NATIONAL ORIGIN CLAIM

 Philip Morris also contests the sufficiency of plaintiff's claim for national origin discrimination made under Title VII. Defendant points out, accurately, that plaintiff's national origin claim was never raised before the EEOC or NYSDHR. As a result, defendant maintains, that claim is barred by Title VII's exhaustion of administrative remedies requirement. *See* 42 U.S.C. § 2000e–5(d) and § 2000e–5(f)(1).

Under the law of this circuit, courts should take a "flexible approach" in interpreting Title VII complaints so as to consider any claim of discrimination "reasonably related to the allegations in the complaint filed with the EEOC." *Silver v. Mohasco Corp.,* 602 F.2d 1083, 1090 (2d Cir.1979); *Kirkland v. Buffalo Bd. of Educ.,* 622 F.2d 1066, 1068 (2d Cir.1980). Claims of racial and national origin discrimination are commonly found to be "reasonably related" when one, but not the other, is alleged in a complaint brought before the EEOC. *E.G., Avagliano v. Sumitomo Shoji American, Inc.,* 614 F.Supp. 1397, 1403 (S.D.N.Y. 1985); *Kahn v. Pepsi Cola Bottling Group,* 526 F.Supp. 1268, 1270 (S.D.N.Y. 1981) ("[The] allegation in the complaint of race discrimination can be viewed as merely a refinement of the charge of national origin discrimination.").

In the instant action there is no doubt but that plaintiff's claims of racial and national origin discrimination are reasonably related, and that as a result defendant and the administrative agencies involved had adequate notice of plaintiff's national origin claim. Not only are the facts underlying both claims identical, but the affidavit Yates submitted with his NYSDHR complaint specifically alleged that "[t]he majority of employees of Philip Morris International Duty Free Sales, U.S.A. Eastern Division, where I worked, are of Greek ancestry," plainly implying that Yates was fired because he was not Greek. Under such circumstances, this Court is not barred from considering plaintiff's national origin discrimination claim.

## III. CONCLUSION

Defendant's motion to dismiss plaintiff's § 1981 claim and to dismiss plaintiff's Title VII claim alleging national origin discrimination is denied in its entirety.

The parties are directed to appear at a status conference May 20, 1988 in Room 307 at 2:30 p.m.

The foregoing is SO ORDERED.