GAMETECH INTERNATIONAL, INC.,
a Delaware Corporation,
Plaintiffs,

v.

TREND GAMING SYSTEMS., L.L.C, a Texas limited liability company,
Defendant.

Trend Gaming Systems, L.L.C, a Texas limited liability company,
Counterclaimant,

v.

Gametech International, Inc.,
a Delaware Corporation,
Counterdefendant.

No. CIV 01–540 PHX–LOA.

United States District Court,
D. Arizona.

May 19, 2003.

Edward Jeffrey Walsh, Jennifer Meredith Dubay, Greenberg Traurig, LLP, Phoenix, AZ, for Gametech Intern., Inc.

Richard E. Chambliss, Broening Oberg Woods Wilson & Cass PC, Phoenix, AZ, for Trend Gaming Systems.

## ORDER

ANDERSON, United States Magistrate Judge.

This matter arises on Trend Gaming System's ("Trend") Motion for Partial Summary Judgment: Improper Termination based upon Pricing. (document # 68) Gametech opposes this motion. (document # 145) Pursuant to FED.R.CIV.P. 56, Trend seeks partial summary judgment on Count I of the First Amended Counterclaim. After considering the pleadings in this matter and arguments of counsel during an April 24, 2003 hearing, the Court denies Trend's Motion for Partial Summary Judgment.

## BACKGROUND

Gametech International, Inc. ("Gametech") is a Delaware corporation in the business of designing, manufacturing, and marketing electronic bingo equipment. (RSOF 74[1]) Trend is a Texas limited liability company in the business of distributing electronic bingo equipment in the state of Texas. The Court has jurisdiction over this matter under 42 U.S.C. § 1332. The parties agree that Arizona law governs the interpretation of the 1999 Distribution Agreement (SOF 73) and that Texas gaming law governs the parties' bingo endeavors in Texas.

In 1995, the parties began their business relationship whereby Trend agreed to act as an exclusive Gametech distributor in Texas. Specifically, Gametech manufactures bingo equipment which it leases to Trend, a distributor, which leases the devices to third parties for use in bingo halls. On November 1, 1999, the parties entered into a Distribution Agreement (the "Agreement") governing the distribution of electronic bingo equipment in Texas. (RSOF 14 and Exhibit A to attachment 2)

In this litigation, Gametech argues that Trend breached the 1999 Distribution Agreement by: (1) providing pricing proposals which did not meet Gametech's minimum return; and (2) executing contracts which failed to specify the placement of Gametech products.[2] On July 22, 2002, Gametech notified Trend in writing that in view of Trend's alleged breaches of the Agreement, Gametech planned to terminate the Agreement or remove bingo equipment unless Trend cured the breaches. To prevent Gametech from terminating the Distribution Agreement, Trend sought a temporary restraining order.

On August 26 and 27, 2002, the Court conducted a hearing on Trend's Application for Temporary Restraining Order. On August 27, 2002, the Court denied the

---

1. Citations to "RSOF" are to Gametech's Controverting Statement of Facts and Additional Facts in Support of [Gametech's] Response. (document # 146)

2. Gametech asserts the right to terminate the Distribution Agreement based upon Trend's use of "generic" contracts with Trend's customers. Trend's motion for partial summary judgment does not address this issue. Therefore, the Court will not consider this issue at this time.

Application finding that Trend failed to meet its burden of proof. (document # 50)

Later that same day, Gametech notified Trend in writing that it was terminating the November 1, 1999 Distribution Agreement based on Trend's "unauthorized" pricing to its customers. (SOF 39 [3]).

In the pending motion, Trend asserts that Gametech's termination of the Distribution Agreement was improper because Texas gaming law prohibits Gametech from controlling or influencing the price Trend charges its customers. The Court will consider this claim after discussing Texas gaming law.

### TEXAS GAMING LAW

To analyze the issues in this matter, the Court will first address Texas gaming law. Under Texas law, a manufacturer, such as Gametech, must be licensed and may only sell or lease bingo equipment to a licensed distributor. TX OCC. § 2001.551(b)(3),(4). Similarly, distributors, such as Trend, must be licensed and may only distribute electronic bingo equipment. *Id.* at § 2001.207,207(6). Under Texas law, only a licensed charitable organization (a "conductor") may conduct a public bingo game where prizes are awarded. *Id.* at § 2001.101–.107. A licensed conductor may only acquire bingo equipment from a licensed distributor, and may not acquire bingo equipment directly from a manufacturer. *Id.* at § 2001.407(e).

Significantly, Texas law also prohibits a manufacturer and a distributor from acting in concert to establish the price of bingo equipment. TX OCC § 2001.556. Texas OCC § 2001.556(b) states that: "The price of bingo supplies and equipment in the competitive marketplace shall be established by the manufacturer, distributor, or supplier and *may not be established in*

*concert* with another manufacturer, distributor, or supplier." *Id.* (emphasis added) The court could find no Texas cases interpreting this statute. However, the Texas Attorney General has issued two opinions interpreting the statute which provide guidance on the relationships between a manufacturer, distributor, and a conductor.

The Texas Attorney General has opined that § 2001.556(b) requires that "each manufacturer, distributor, and supplier must act independently in setting prices" and that "Section 2001.556 prohibits all express and implied price fixing agreements, regardless of their effect." Tex. Atty. Gen. Op. JC–0296 (hereinafter the "2000 Opinion"). In the 2000 Opinion, the Attorney General concluded that a contract between a manufacturer and a distributor agreeing to the price at which the distributor will sell or lease bingo equipment would violate § 2001.556. *Id.*

In so finding, the Attorney General noted that although § 2001.556's prohibition against "price fixing" is reminiscent of antitrust law, antitrust law does not guide the interpretation of § 2001.556. The 2000 Opinion explains that the language of § 2001.556 is not modeled on Texas antitrust law which generally looks to the economic effect of an agreement. Section 2001.556, on the other hand, prohibits all express and implied price fixing agreements regardless of their effect. *Id.* The statute "is concerned less with free enterprise and competitive pricing than with strict regulation of manufacturers and distributors of bingo equipment, and their relationship with persons who conduct bingo." *Id.*

Finally, the Attorney General noted that the limitation set forth in § 2001.556 ex-

---

**3.** Citations to "SOF" are to Trend's "Statement of Facts in Support of Motion for Partial

Summary Judgment: Improper Termination Based upon Pricing" (document # . . .)

tends to any "contract provision that prohibits unilateral discounts, credits, and allowances—terms that affect the ultimate price paid by the consumer." *Id.*

In a 2002 opinion, Tex. Atty. Gen. Op. JC–0450 (hereinafter the "2002 Opinion"), the Texas Attorney General again considered § 2001.556 and concluded that "[a] revenue-share leasing agreement violates section 2001.556 of the Occupations Code ... if under the agreement the manufacturer controls the price that the distributor charges to bingo-game conductors for leasing equipment." *Id.* The Attorney General explained that § 2001.556 does not prohibit all revenue share leasing agreements. Rather, § 2001.556 prohibits revenue-share lease agreements in which the manufacturer and distributor agree on the price that the distributor will charge the conductor. *Id.*

### THE 1999 DISTRIBUTION AGREEMENT

As previously stated, Trend and Gametech were parties to a 1999 Distribution Agreement (the "Distribution Agreement"). (SOF 36, 38; RSOF exhibit A to attachment 2) Under this arrangement, Trend would lease equipment to bingo conductors (referred to as "Placement Agreements") and collect revenue from its customers under either a revenue sharing or an inventory pricing model. (RSOF 82; SOF 28, 29, 33) As compensation for the lease of the equipment, Trend paid Gametech a percentage of the revenues which Trend collected from its customers. (SOF 40; RSOF 82)

Pursuant to the relationship between Trend and Gametech, nearly all of the product that Gametech supplied Trend was provided on a revenue sharing basis. (RSOF 82) Under this arrangement, Trend did not pay Gametech a fixed amount of money for the equipment. Rather, Trend leased product to conductors and collected

revenue. The parties shared in the monies generated from the use of the equipment. (RSOF 82) Trend would remit to Gametech either 84 % or 78 % of revenue it collected from customers (depending on whether it was an "old" or "new" account) and kept the remaining revenue as compensation under the Distribution Agreement. (Exhibit A, Article 4.1, to RSOF attachment 2)

On October 22, 2001, Gametech issued a new price schedule. (RSOF 81) Gametech contends that this agreement established a minimum rate of return and that Trend had to adhere to the October 22, 2001 price schedule to ensure that Gametech would receive its "minimum rate of return." (document # 145 at 5)

The Distribution Agreement contained language which came under scrutiny by the Texas Lottery Commission ("TLC") in 2000 before the issuance of the October 22, 2001 price schedule. Specifically, the TLC challenged articles 5 and 3.2 of the Distribution Agreement. Under Article 5, the parties agreed to "jointly establish customer pricing arrangements." (SOF 42; RSOF Exhibit A to attachment 2, article 5) Under Article 3.2 of the Distribution Agreement, Trend was to "only provide Gametech approved pricing information to prospective customers." (SOF 41; RSOF Exhibit A to attachment 2, article 3.2) These provisions appeared facially to violate the Texas Price Fixing statute. See, TX OCC § 2001.556(b)("The price of bingo supplies and equipment ... may not be established in concert with another manufacturer, distributor, or supplier.")

Accordingly, in 2000, the TLC brought charges against Trend and Gametech alleging that they had violated the Bingo Enabling Act by conspiring to fix the price at which bingo equipment or supplies may be sold. (RSOF 85) During a January 2002 hearing, representatives from Trend

and Gametech testified regarding the meaning of the challenged contractual provisions. Gametech testified that the "jointly established pricing" provision under Article 5 meant that "Gametech and Trend will come to an agreement as to what Gametech is going to recover per unit." (SOF 52, Exhibit 3 to TRO SOF at p. 357 line 15—p. 358 line 3; RSOF 50) With respect to the use of Gametech approved pricing information under § 3.2 of the Distribution Agreement, Gametech testified that "[w]hat we've approved is an agreed upon price that Gametech is to be paid by Trend for the use of its units." (SOF 50; Exhibit 3 to TRO SOF at p. 356 lines 5–10) Trend testified that § 3.2 of the Distribution Agreement was used to determine Gametech's return. (SOF 51, Exhibit 3 to TRO SOF at p. 280 line 24–p. 281 line 5) Gametech testified that it had not instructed Trend what to charge a bingo conductor. (SOF 55; RSOF 51) Gametech also testified that it had not instructed Trend as to any minimum floor price that Trend must charge bingo conductors. (SOF 47) Gametech also testified that it does not have knowledge of, nor does it have to approve, every price arrangement that Trend proposed to its customers. (SOF 58; RSOF 50)

On May 10 2002, the Administrative Law Judge ("ALJ") entered a Proposal for Decision. (RSOF 86, Exhibit C to attachment 2) The ALJ found that Gametech and Trend had agreed upon the amount of compensation that Trend would pay Gametech for the use of the equipment. (*Id.*) The ALJ found that Trend sets the price to be charged to a bingo conductor that would cover the agreed upon compensation that Trend would pay Gametech for the equipment. *Id.* The ALJ also found that Gametech did not instruct Trend on the price to be charged its customers. *Id.* The ALJ ultimately concluded that neither Gametech nor Trend had fixed prices in violation of the Texas Bingo Enabling Act.

(Exh. C to RSOF, attachment 2 at p. 11) On June 10, 2002, the TLC entered an order adopting the ALJ's Findings of Fact and Conclusions of Law. (RSOF 88, Exhibit D to attachment 2)

■ Gametech argues that the TLC's decision collaterally estops Trend from arguing that Gametech's insistence upon a required rate of return violates the Bingo Enabling Act. (document # 145 at 14) Gametech asserts that the issue of whether the parties' relationship comports with Texas law was fully litigated and resolved and is binding on this Court. See, *Coalition of Cities for Affordable Utility Rates v. Public Utility Comm'n of Texas*, 798 S.W.2d 560, 563–64 (Tex.1990)(stating that res judicata and collateral estoppel apply to administrative orders when the agency is acting in a judicial capacity and resolved the disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate.); *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 421–22, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966)(same).

Gametech asserts that after the TLC's decision, it continued to conduct business in the same manner that the TLC had reviewed and approved. Gametech further contends that the TLC approved the October 22, 2001 price agreement.

As set forth below, after the TLC's decision, Trend did not continue to operate in the same fashion. Rather, Trend began offering inventory pricing at a flat rate. Trend's conduct prompted Gametech to send Trend a July 22, 2002 letter noticing Trend's alleged breach of the Distribution Agreement. (SOF 71, Exhibit 45 to TRO SOF) The July 22, 2002 letter also stated that Trend could cure the breach by amending or rescinding its contracts and providing assurance that Gametech would receive its minimum rate of return. Trend asserts that the July 22, 2002 letter com-

bined with the October 22, 2001 price schedule constitutes evidence that Gametech was attempting to engage in price fixing. Trend also asserts that the October 22, 2001 price schedule was neither presented as evidence to the TLC nor considered by the TLC. Because Trend's motion for partial summary judgment is based on facts which arose after the TLC proceedings, Trend asserts that collateral estoppel does not apply.

The Court agrees with Trend. In 2000, the TLC initiated proceedings challenging the 1999 Distribution Agreement. Based on the evidence before the Court, it appears that the record before the TLC was limited to the 1999 Distribution Agreement. (document # 149, Exh. A) Moreover, Trend's motion for partial summary judgment is based on facts which arose after the TLC's decision. Therefore, collateral estoppel does not apply and the Court, therefore, will proceed to consider Trend's alleged breach of the 1999 Distribution Agreement and the pending motion for summary judgment.

### TREND'S ALLEGED UNAUTHORIZED PRICING AND DEFAULT

After the conclusion of the TLC proceedings, in approximately May of 2002, Trend began offering conductors an inventory pricing plan at a flat rate of $15.00 per week per unit (the "Inventory Pricing"). Trend advised Gametech of this pricing plan after the fact. Gametech contends that this pricing program was based on an unjustified interpretation of the October 22, 2001 pricing schedule. (document # 145 at 7) Gametech argues that under the October 22, 2001 price schedule, Gametech's minimum rate of return was to be calculated as the greater of a percentage of customer revenue or a fixed sum per unit (i.e. the floor). (RSOF 91) Gametech and Trend would then split the revenue which Trend collected either 84%—16% or 78% –22%, depending upon the customer.

Gametech contends that Trend's 2002 pricing scheme calculated Gametech's minimum rate of return by multiplying the floor rate to the customer ($2.00) by (i) 84% or 78%; (ii) nine sessions; and (iii) a seventy percent utilization rate. (RSOF 94) Gametech contends that this yielded a maximum payment to Gametech of $9.83 per unit per week. (document # 145 at 8) Gametech asserts that Trend's use of a fixed rate of 9 sessions in calculating Gametech's return was not proper. (document # 145) Gametech also argues that Trend's use of a 70% utilization rate was not a proper application of the 2001 price schedule. (*Id.*)

Based on its belief that it would not receive its required return from Trend, Gametech advised Trend that its pricing scheme "provided ... customers with Gametech products at prices that generated revenues well below the minimum return to which Gametech was entitled under the October 22, 2001 price schedule." (document # 145 at 6) Based on that belief, on June 19, 2002, Gametech told Trend that "you cannot do an 'inventory deal' with your customers on the basis of the October 2001 price schedule". (SOF 65; RSOF Exhibit H to attachment 2) Specifically, in a June 19, 2002 e-mail, Gametech stated that:

> According to a June 3 letter from Tres Grey [a Trend sales representative] to John Milloy at Brush Country services, Inc., [a charity], you are offering your customers the handheld units at a flat rate of $1.07 per session and fixed base units at $2.00. The minimum pricing on TEDs in Gametech's October 2001 price schedule is $2.00 per session, and on fixed base units it is $2.75. At a return to Gametech of from 78% to 84 %, you are pricing below the cost of the product to your company ... Your letters to customers offering below cost pricing are a misrepresentation of the terms

that you are able to legitimately offer to them for Gametech products.

(document #145 at 11)(citing Exhibit H to RSOF Attachment 2)

On July 9, 2002, Gametech demanded that Trend either rescind or amend the two Placement Agreements which used Inventory Pricing, or Gametech would "take such measures as may be necessary to protect its rights in the Texas Market." (SOF 66 and 67; RSOF Exhibit I to attachment 2) Gametech also stated that unless Trend first produced copies of placement agreements which guaranteed Gametech its minimum rate of return, it would not provide any equipment. (SOF 68; RSOF, Exhibit I to attachment 2)

Specifically, in a July 9, 2002 e-mail Gametech stated that:

> You have proposed to customers an inventory price for the units based upon a $2.00 per use internal rate of return to Trend and Gametech, multiplied by a 70% utilization rate. This renegade pricing scheme would yield a price to the charity of $1.07 per session at 14 sessions per week, and a payment to Gametech of not better than .89 per session, about half the rate of return required by our price schedule. Gametech has never agreed to accept a fixed weekly return on its units calculated on that basis.

(document #145 at 11)(citing Exhibit I to RSOF Attachment 2)

The July 9, 2002 e-mail further states:

> You have had more than 30 days notice that this conduct is in violation of your agreement with us. This is a deliberate material breach of the Distribution Agreement. We demand that you provide written evidence to us within 24 hours that you have either rescinded or amended those contracts, and further that your pricing to all of your customers assures Gametech of the required minimum rate of return on its products . . . If you fail to do so, Gametech shall

take such measures as may be necessary to protect its rights in the Texas market. (RSOF Attachment 2, Exhibit I)

Thereafter, in letter dated July 22, 2002 ("Default Notice" or "Notice of Default"), Gametech notified Trend that it was in "material breach" of the Distribution Agreement. Gametech argued that Trend was in violation of Articles 3.2 and 5 of the Distribution Agreement by making "pricing proposals for Gametech's products to existing and potential customers on a scheme that does not provide Gametech with its required minimum rate of return." (SOF 71, Exhibit 45 to TRO SOF) To cure this breach, Gametech stated that "Trend must rescind or amend any such contracts" and enter into agreements with conductors that ensure that Gametech receives its required minimum rate of return. (SOF 72, Exhibit 45 to TRO SOF)

Trend neither amended nor rescind the contracts as Gametech requested. Thus, based upon Trend's refusal to terminate or amend the Placement Agreements that offered Trend's customers the alleged "renegade pricing plan," Gametech terminated the Distribution Agreement on August 27, 2002. (SOF 39, Exhibit A)

Trend contends that the language of Gametech's July 22, 2002 Default Notice indicates that Gametech was attempting to control the price that Trend charged its customers in violation of Texas gaming law which prohibits price fixing between a manufacturer and a distributor of bingo equipment. See, TX OCC § 2001.556. As previously stated, Texas gaming law prohibits a manufacturer from controlling the price that a distributor charges a conductor for use of bingo equipment. *Id.* Thus, Trend argues that it was improper for Gametech to terminate the Distribution Agreement based on Trend's refusal to participate in what Trend characterizes as price fixing.

Gametech, however, contends that the July 22, 2002 Notice of Default merely expressed Gametech's concern that the pricing which Trend was offering its customers was insufficient to provide Gametech with its required "minimum return." (document # 145 at 10; RSOF 110–111) Gametech asserts that neither the October 22, 2001 price schedule nor the Notice of Default constitute an attempt to control the price Trend charged bingo conductors for the use of bingo equipment. (document # 145 at 11–12; RSOF 113, 114)

### ANALYSIS

A moving party may, at any time, move for summary judgment on all or any part of a claim. See, FED.R.CIV.P. 56(f) The Court may only grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, determines that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." See, FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Substantive law determines which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering the evidence, the Court is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

▪ Trend contends that the issue before the Court only involves the interpretation of the terms and conditions of a contract which is a matter of law for the

Court. *Hadley v. Southwest Properties, Inc.,* 116 Ariz. 503, 570 P.2d 190 (1977). The Court disagrees. This matter turns on whether Gametech was attempting to control the price which Trend charged its customers. See, Tex. Atty. Gen. Op. JC–0296 (2000); Tex. Atty. Gen. Op. JC–450 (2002). This is an issue of fact for the jury to decide. See, *Lubbock Beverage Co., Inc., v. Miller Brewing Co.,* 2002 WL 31011266, (N.D.Tex.2002)(unpublished)(denying plaintiff's motion for summary judgment finding that plaintiff had failed to offer factual support for its claim that manufacturer coerced plaintiff to engage in resale price maintenance in violation of § 102.75 of the Texas Alcoholic Beverage Code[4].); *Moore v. Jas. H. Matthews & Co.,* 473 F.2d 328, 332 (9th Cir.1973)(finding that limited proof regarding practice of excluding monuments other than those of a particular manufacturer presented material issues of fact as to price-fixing conspiracy precluding summary judgment).

▪ The Court agrees with Trend that, under Texas law, Gametech may only control the price to be paid by Trend. Gametech cannot make demands that affect the price to be paid by a conductor. The parties, however, dispute whether Gametech was attempting to control the price which Trend charged conductors or whether Gametech was merely concerned with the price to be paid by Trend for the equipment.

Trend agrees that Gametech is entitled to receive its "minimum return." Accordingly, Trend states that if Gametech had notified Trend that the Inventory Pricing generated revenue to Gametech that was,

---

**4.** In the 2000 Opinion, the Texas Attorney General compared § 2001.556 to § 102.75 of the Texas Alcoholic Beverage Code which prohibits beer manufacturers from fixing or maintaining the price at which a distributor may sell beer. See, Tex. Atty. Gen. Op. JC–0296 (2000). Although the Court could not find any case law interpreting section 2001.556, the Court finds the 2000 and 2002 Attorney General Opinions, along with the *Lubbock Beverage* case indicate that the determination of whether a manufacturer is exerting control over the price a distributor charges is fact sensitive.

for example, $1.00 less than Gametech's required minimum return and demanded that Trend pay Gametech the difference, Gametech would have the right to terminate the Distribution Agreement if Trend failed to pay the difference within the thirty-day cure period provided in the Agreement. The Notice of Default states that Trend was in breach by "using pricing proposals to customers on a scheme that does not provide Gametech with its required minimum rate of return." (SOF 70) The notice of default also set forth the cure acceptable to Gametech: rescind or amend the objectionable contracts with your customers, and provide Gametech with assurances that the contracts with provide Gametech with its minimum rate of return. (SOF 71) The parties dispute whether this demand constitutes evidence of Gametech's attempt to engage in price fixing in violation Texas law. (document # 145 at 12 citing RSOF at 114, 115, 116) Similarly, the parties dispute whether Gametech terminated the Distribution Agreement based on Trend's refusal to participate in price fixing or based on Trend's failure to provide Gametech with its required minimum rate of return. In view of these material factual disputes, the Court will deny Trend's motion for partial summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** Trend's Motion for Partial Summary Judgment (document # 68) is **DENIED.**